**SHERRY R., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.**

No. S–10831.

Supreme Court of Alaska.

Aug. 1, 2003.

Kathleen A. Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Karla Taylor–Welch, Assistant Attorney General, Fairbanks, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Sherry R. appeals the superior court's judgment that terminated her parental rights to her children, Doug R., Adam R., Jacob R., and Amy R.[1] The trial court determined that clear and convincing evidence established that Sherry R. failed to remedy within a reasonable period of time the conduct or conditions that placed the four children at substantial risk of harm. Because the superior court's findings were not clearly erroneous, we affirm the termination of Sherry R.'s parental rights.

## II. FACTS AND PROCEEDINGS

### A. The Children

Sherry R. has four children with David E.: Doug, born 1990; Adam, born 1994; Jacob, born 1995; and Amy, born 1997.

#### 1. Doug

Doug is Sherry R.'s oldest child. He was born in 1990. The Division of Family & Youth Services (DFYS) took temporary custody of Doug in 1992 because his mother, who was living at the Clare House, was too intoxicated to care for him. The case against Sherry was dismissed and Doug was returned to her custody. DFYS referred Sherry to housing and public assistance and provided her with transportation.

In November 1998 Doug's foster mother took him to Tanana Valley Clinic in Fairbanks for a medical evaluation. Dr. Marvin E. Bergeson, a pediatrician, evaluated Doug for signs of possible fetal alcohol syndrome or fetal alcohol effect. From the evaluation, Dr. Bergeson suspected prenatal exposure to alcohol and suggested that prenatal exposure to cocaine was possible.

In May 2001 a custody investigator interviewed Doug. When the custody investigator asked Doug if he missed his mother, he shrugged his shoulders and responded, "I have people to play with that keep me company." According to the custody investigator, Doug reported that his mother drinks frequently. The guardian ad litem (GAL) noted in her report that Doug had concerns about returning to live with his mother. Doug believes his mother might start to drink again.

#### 2. Adam

Adam was born in 1994. Dr. Bergeson diagnosed Adam with atypical fetal alcohol syndrome in 1999. Dr. Bergeson observed that Adam had a significant number of features common to children who are prenatally exposed to alcohol including: short stature, very small eyes, ears that rotated out and are cupped, pegged teeth, severely crossed eyes and one eye that turned in severely.

Adam has been enrolled in special education classes because he has a communication disorder and is visually impaired. Additionally, his special education teacher has noted that Adam shows signs of learning disabilities in reading and math. The custody investigator reported that Adam exhibits some behavioral problems. He sucks his thumb constantly and can be quite moody.

According to the GAL, Adam's teacher reported that Adam blossomed while he was

---

1. We use pseudonyms to protect the family's privacy.

in foster care. She reported in 2002 that while Adam used to be "in a shell," his sense of humor was becoming more apparent. She also noted that he had made significant progress towards being mainstreamed in the 2002–03 school year.

Adam wishes to remain with his foster family. He is concerned that if he goes to live with his mother or father, they will fight.

### 3. Jacob

Jacob was born in 1995. Dr. Bergeson determined that Jacob may have been prenatally exposed to alcohol. Although he did not exhibit the major physical features associated with fetal alcohol effects, he suffered from significant speech and language delays that his pediatrician "felt were probably attributable to the alcohol exposure but could also be related to cocaine or marijuana exposure." Dr. Bergeson noted in his 1998 evaluation that Jacob was very difficult to understand and was probably understandable less than ten percent of the time. Additionally, Jacob had a history of being socially inappropriate and physically aggressive towards others. Jacob takes medicine for impulse control and aggression. His pediatrician has diagnosed him with unsocialized disorder and attention deficit disorder. The doctor explained that unsocialized disorder means that Jacob "doesn't pick up on social cues ... [and has] no impulse control."

Jacob has difficulty respecting authority and transferring appropriate behavior learned in one setting to a new setting. Jacob acts aggressively towards his peers—hitting, pushing, and grabbing other children—and has thrown chairs in his classroom.

Jacob's counselor, Karin Gillis, reported that his behavior improved markedly after being placed in foster care. Gillis noted that Jacob's play became less violent, his language less foul, and he interacted more appropriately with his brother. Gillis attributed these changes to the stable environment provided by his foster parents. Gillis noted that Jacob "is a kid that has real special needs and will need stability, consistency, of course lots of love and encouragement and a positive behavioral plan ... that the person

that's going to take care of him can really [ ] stick to."

### 4. Amy

One month before Amy was born in 1997, her mother tested positive for cocaine. Sherry admitted to using cocaine during her pregnancy. One day after Amy's birth, DFYS took her into their custody. Dr. Bergeson diagnosed Amy with atypical fetal alcohol syndrome and noted that she suffers from a speech delay.

### B. Sherry's Substance Abuse

Sherry has struggled with drug and alcohol abuse for many years. Sherry's alcohol abuse precipitated DFYS's initial contact with her family. DFYS first took custody of one of her children in 1992 because Sherry was intoxicated and could not take care of him. DFYS has received numerous reports alleging substance abuse by Sherry.

Sherry has attempted substance abuse treatment on several occasions between 1996 and 2001. The record suggests that she has participated in seven separate treatment programs. Of those, she has left four, three of those due to noncompliance, has been discharged from one, and has completed two.

In April 1996 DFYS referred Sherry to their substance abuse program. However, Sherry was unsuccessful in completing the treatment. Because of noncompliance, ongoing substance abuse, and "disruptive classroom behaviors," she was discharged from the program in July 1996. It was then recommended that Sherry complete an intensive residential treatment program; she was referred to Clitheroe's twenty-eight-day program. Sherry was also unsuccessful in completing the Clitheroe program. She left the program against treatment advice in August 1996. At that time, Sherry was pregnant with Amy, and Clitheroe therefore recommended that she complete a treatment program for pregnant women such as the Dena Coy program. That same month, the superior court ordered Sherry not to return to the family residence until she had completed substance abuse rehabilitation. It appears that Sherry did not begin the Dena Coy program

in the fall of 1996, but rather started outpatient treatment through the Individualized Recovery Intervention Service treatment program in September 1996. Between September 1996 and October 1996, DFYS received four reports of harm alleging substance abuse in the R. home. Additionally, according to DFYS records, Sherry's progress in the treatment program was poor. Anchorage police were called to the home fourteen times between October 1 and October 27, 1996. Sherry was ultimately discharged from the Individualized Recovery Intervention Service treatment program because of noncompliance.

In November 1996 the children were removed from the home and placed in foster care. Sherry spent one week in the Dena Coy treatment program, leaving because she would not comply with their no smoking policy. In April 1997, two months after Sherry gave birth to Amy, Sherry entered the Women and Children's Recovery Program in Fairbanks. Between April and November 1997, all four children were returned to Sherry's physical custody. Sherry completed the Women and Children's Recovery Program in November 1997 and then entered their transitional treatment program. The program personnel discharged Sherry in April 1998, reporting that Sherry was "resistant to treatment." It was also reported at that time that Sherry had "effectively alienated herself from her entire support network," that her potential for relapse was "high," and her progress "poor." [2]

Sherry submitted to three of nine requested random urinalysis tests (UAs) between April and August 1998. The results of all were negative. However, shortly thereafter, she relapsed. In September 1998 Sherry admitted to using crack. In October 1998 the children were removed from Sherry's home because the superior court found that staying with Sherry would be "contrary to the welfare of the children." Sherry had

been using cocaine and had resisted entering a treatment program.

In November 1998 Sherry attempted treatment again. She entered the detoxification program at the Regional Center for Alcohol and Other Addictions (RCAOA), and began their residential program on December 1, 1998. She stayed for three months and successfully completed the program in March 1999.

Sherry relapsed again, however. Shortly after her discharge from RCAOA, she used crack. In April 2001 Sherry reported that she had not used crack since June 1999. She continued to use other drugs though. On December 20, 2000, Fairbanks police officers conducted a child welfare check at Sherry's home which resulted in DFYS taking emergency custody of the children. A call from Doug to his father telling him that Sherry was intoxicated precipitated the police officers' check. When the police arrived at Sherry's house, they found marijuana in her pocket and Sherry admitted that she had smoked marijuana earlier that night. The children were placed in two separate foster homes.

In January 2001 it was recommended that Sherry enter an intensive inpatient treatment program in Anchorage at a dual diagnosis facility. Sherry refused the inpatient treatment, opting for outpatient care through Inroads to Healing in Fairbanks. The GAL reported that Sherry completed the Inroads to Healing substance abuse program in November 2001. The GAL noted that Sherry's substance abuse counselor, Betsy Cicilese, expressed reluctance to accept Sherry to the program because she knew that Sherry had already unsuccessfully attempted at least four treatment programs. However, Cicilese reported that Sherry was one of the program's best participants. Sherry did not miss a group or individual session. Additionally, according to the GAL report, Sherry has taken UAs on a regular basis, none of

---

2. In terms of Sherry's experience with the Women and Children's Recovery Program in Fairbanks, two reports in the record present two slightly different versions of the facts. The facts recounted above reflect those described in the Annual Review of Child in Need of Aid Report, dated September 13, 1998. The Petition for Termination of Parental Rights differs in that it says that three weeks after Sherry successfully completed the inpatient and aftercare components of the Women and Children's Recovery Program, she relapsed and resumed using crack.

which have tested positive for drugs. However, several specimens were diluted.

Sherry admits that she has had problems with alcohol. However, the degree to which she acknowledges her drinking problem is debatable. When asked at the termination hearing whether she considers herself an alcoholic, she responded: "I'm not real sure. I know I have problems with alcohol but I've been to AA and I still go.... [T]o a degree of [ ] alcoholism ... I would agree with it. But full blown alcoholic, I don't think so." Sherry testified that her last drink was July 27, 2001, and that she has not used crack cocaine since 1999.

### C. Abusive Relationships

Domestic violence has been another significant factor in Sherry and her children's lives. Sherry describes many of her relationships with men as abusive. In a March 1996 police report, Sherry stated that David E. "grabbed her by the arm, shook her and threw her onto her bed," and that when she landed on the bed, her head hit her nineteen-month-old son's head. Two months later, in May 1996, Sherry reported that David kicked her, smashed a cigarette into her face, and hit her. In November 1996 the court removed the children from their father's home in part because of reports of domestic violence between him and Sherry. Similarly, shortly after Amy's birth, the superior court committed her to DFYS's temporary custody in part based upon reports of domestic violence between Sherry and David. Sherry and David both obtained restraining orders against each other at different times. David testified that at one point, he moved with the children from hotel to hotel in Fairbanks to avoid confrontations with Sherry. During a 1997 psychological evaluation with Dr. Frank Nelson, Sherry said that when she was drinking she would sometimes yell, scream, and throw things at David.

Following Sherry's relationship with David, she became involved with a man named Robert whom she began dating in 1999. According to Sherry, Robert was abusive to her. During their relationship, Robert hit Sherry in the head with a space heater, which resulted in Sherry going to the hospital. Sherry stopped seeing Robert in July 2001.

Sherry then began seeing Jerry B. Sherry knew that Jerry had spent thirty years in and out of prison. Sherry testified that Jerry wanted to tell her about his past, but that because she was "going through a lot of stuff" she did not want to know. She testified that Jerry was treating her well. "I was trying to get my life together and I had just gotten out of a rotten relationship and I wasn't ready for one. And so that's when I said I didn't want to know all that right then." Sherry envisioned a future with Jerry that included his taking part in raising the children. Jerry joined Sherry in her visits with the children. However, she continued to avoid asking him about his past. "I figured he was treating me good, he was doing things for the kids, ... he wasn't an abusive person ... whatever he did in his past he did his time for it and he paid his price. So I ... didn't feel like I needed to dig into a whole bunch of details." But Jerry has been convicted of a number of serious felony offenses including sexual abuse of a minor. When Sherry learned of this offense, Jerry B. moved out. Because of his conviction, the public housing agency would not allow him to live in Sherry's apartment.

Even after learning of Jerry B.'s conviction for sexual abuse of a minor, Sherry was reluctant to sever ties with him. Additionally, Sherry seems to deny that Jerry is guilty of the offense. When asked at the termination trial whether she had been willing to sever ties with Jerry, Sherry replied: "There's been allegations and so far he hasn't been in here ... to testify to substantiate and if this is the case and this turns out to be true, yeah, because there is no way I'd have anybody like that doing anything like that to my children." During the termination trial in July 2002, Sherry was seen with Jerry at one of the R. children's soccer matches.

Because Sherry identified Jerry as her partner to JoAnne Simmerman, the DFYS social worker, Simmerman incorporated him into the R. family case plan in March 2002. Jerry told Simmerman that his thirty-year criminal history included assault, robbery, and car theft. He also told her that he had a

history of drinking. Based upon this information, Simmerman requested that Jerry complete a substance abuse evaluation, a behavioral assessment to determine whether he needed anger management classes, and a family assessment to determine the strengths and weaknesses of Sherry and Jerry's relationship in terms of raising children. Simmerman also requested that Jerry submit to random urinalysis. According to Simmerman, Jerry completed the requested evaluations, but he never submitted to urinalysis testing.

Sherry and David continue to argue, even though they are no longer living together. At a visit with the children at DFYS in May 2002, they fought over a video camera. During the confrontation, Adam crawled under a table. Thereafter, JoAnne Simmerman, the DFYS social worker, scheduled separate visits for David and Sherry and mandated that none of the adults—Sherry, Jerry, or David—argue in front of the children.

At the termination trial, Dr. Marti Cranor gave her opinions as to how Sherry's poor relationship choices could adversely affect the children. Dr. Cranor explained that in a home where the adults argue frequently and where there may be physical fights, it is difficult to maintain the routine that the children need. Additionally, Dr. Cranor explained that her greatest concern was that Sherry might focus on her relationship with her boyfriend to the detriment of the children's needs.

### D. Procedural History

On January 2, 2002, DFYS filed a petition for termination of parental rights. DFYS petitioned to terminate the rights of both David and Sherry; however, as David does not appeal the termination, we focus only on the facts relevant to Sherry. DFYS alleged that the R. children had been subjected to substantial physical and emotional harm and were at risk of substantial harm due to their parents' actions. The petition noted Sherry's long history of substance abuse, her ineffec-

tive attempts at treatment, her choice of abusive partners, and her psychological problems as barriers to being an effective parent. DFYS argued that Sherry had not remedied her conduct as she had not followed her case plan or the activities directed by the court. DFYS concluded that if the R. children were placed with either parent, the children would be in danger of significant emotional or physical harm. The petition noted: "Although [Sherry] is sincere in her desire to change her behaviors she has been unable to demonstrate that she has the ability to provide a safe and nurturing home for her children."

Trial on the petition for termination was held in Fairbanks between July 22 and July 26, 2002, and on August 2, 2002 before Superior Court Judge pro tem John Lohff. In his findings, the trial judge noted that "[w]hile [Sherry] made tremendous progress in her substance abuse treatment, her sobriety is a relatively new thing in the . . . history of this case." In addition, Judge Lohff noted that Sherry seemed unable "to face unpleasant realities such as the troubled past of her current partner and the diagnosis about the effects of alcohol on three of her children." The court also observed with regard to Sherry's substance abuse history: "[Sherry] is still fragile in her sobriety and that sobriety would be at great risk because of the immense needs of the children." Because the court concluded that Sherry was unable to safely and consistently care for her children, it terminated her rights and responsibilities with regard to her children. Sherry appeals.

### III. STANDARD OF REVIEW

When reviewing a trial court's factual findings concerning the termination of parental rights, we apply the clearly erroneous standard of review.[3] We find clear error only when our review of the entire record leaves us with "a definite and firm conviction that the superior court has made a mistake."[4] We review de novo whether the superior court's factual findings satisfy applicable child in need of aid statutes and rules.[5]

---

**3.** *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002).

**4.** *Id.*

**5.** *Id.* at 1122–23.

## IV. DISCUSSION

### A. The Trial Court Did Not Err in Concluding that Sherry Failed, Within a Reasonable Time, To Remedy the Conduct or Conditions in the Home that Place the R. Children at Substantial Risk of Physical or Mental Injury.

Parental rights may be terminated under AS 47.10.088 if the superior court finds by clear and convincing evidence that the child is in need of aid under AS 47.10.011 and that the parent:

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.

In making a determination whether the parent has remedied or will, within a reasonable time, remedy the conditions in the home that place the child at substantial risk, the court may consider any fact relating to the best interests of the child.[6] Judge Lohff found that the children were in need of aid and that Sherry had failed, within a reasonable time, to remedy the conduct or conditions that placed the R. children at substantial risk of physical or mental injury. Accordingly, Judge Lohff terminated Sherry's parental rights.

Specifically, Judge Lohff found that the R. children are in need of aid under four statutory factors: AS 47.10.011(1) (abandonment); AS 47.10.011(8) (mental injury); AS 47.10.011(10) (substance abuse of the parent); and AS 47.10.011(11) (mental illness of the parent). In his ruling from the bench, Judge Lohff noted that Sherry

> has made tremendous progress in her substance abuse although it's a year into it

and with apparent complete success in terms of abstinence, it's still a new thing. We hope—all hope it continues to be a long term thing but it's not the complete availability for the children yet that we . . . need.

Sherry does not contest the court's finding that her children are in need of aid. Rather, she contends that the trial court erred in concluding that she failed to remedy the conditions that placed her children at risk. Sherry argues that she has been sober "for a sufficient period of time to demonstrate her ability to remain sober" regardless of the stresses that she might encounter while raising her children.[7]

Sherry argues that because she had been sober for approximately one year prior to the termination trial, she has remedied, within a reasonable time, the conduct or conditions that put her children at risk of harm. Sherry testified at the termination hearing that she had her last drink on July 27, 2001, and that since July 28, 2001, she has attended AA meetings regularly. Since her last drink, Sherry has submitted to random urinalysis testing. This evidence supports Sherry's contention that she maintained sobriety for a year prior to the start of the termination trial in July 2002.

However, as Judge Lohff noted, Sherry's sobriety is a relatively new phenomenon in her life. She has struggled with substance abuse and relapsed after treatment a number of times. Additionally, although she recognizes that she has had problems with alcohol, it is unclear the degree to which she accepts her problem.

Sherry argues correctly that her situation is distinguishable from *S.H. v. State, Department of Health & Social Services, Division of Family & Youth Services.*[8] Unlike Sherry's maintenance of a year of sobriety, S.H. admitted to using cocaine only four months before her termination hearing.[9] Unfortunately, even though Sherry may have

---

6. AS 47.10.088(b).

7. Sherry also makes an argument concerning her personality disorder, however, because we affirm the trial court's decision on other grounds, we do not address this argument.

8. 42 P.3d 1119 (Alaska 2002).

9. *Id.* at 1122–24.

made strides towards remedying her conduct, the trial court could properly find that Sherry failed to address her substance abuse problem within a reasonable time. The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior. It seems that Judge Lohff relied upon Sherry's long history of substance abuse in making his determination. He commended her for her success, but noted that her sobriety is still very new.

Moreover, even since sobriety, Sherry has continued to make choices that affect her children's lives adversely, specifically, her romantic involvement with Jerry. Jerry has been convicted of child sexual assault. Concerning her relationship with Jerry, Sherry argues that she showed that she made the right choice by asking Jerry to move out of her apartment when she learned of his sex offenses. As the State correctly argues, the record refutes Sherry's assertions of good judgment. Despite the fact that Jerry wanted to share the details of his past with Sherry, she did not want to know because she was "going through a lot of stuff." At trial Sherry testified: "I figured he was treating me good, he was doing things for the kids, . . . he wasn't an abusive person . . . whatever he did in his past he did his time for it and he paid his price. So I . . . didn't feel like I needed to dig into a whole bunch of details." Additionally, Sherry continued to see Jerry even after he moved out of the house. During the termination trial in July 2002, she was seen with him at one of the children's soccer matches. Sherry persisted in exposing her children to Jerry, despite her knowledge of Jerry's history of sexual abuse.

There is also evidence in the record that Sherry fails to recognize her children's special needs. Sherry argues that she acknowledges their needs, has gathered information about fetal alcohol exposure and its effects, and is prepared to meet her children's special needs. However, these arguments are refuted by the record. At trial, Sherry only admitted that her children's problems "could be" due to the fact that she drank while pregnant with them. When asked what she thought about the testimony of the three younger children's alcohol-affected diagnoses, she replied "I really don't know what to think." Sherry has tried to learn about fetal alcohol syndrome, but her testimony suggests that she does not fully accept or understand her children's disabilities.

As Judge Lohff's determination was not clearly erroneous, we affirm the superior court's conclusion.

## V. CONCLUSION

Because the trial court did not clearly err in finding that Sherry R. failed to remedy the conduct or conditions that placed the R. children at substantial risk of harm, we AFFIRM the trial court's decision to terminate Sherry R.'s parental rights.