NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DANE T., | ) | |
| | ) | Supreme Court No. S-16016 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-00112 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT[*] |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1584 – May 23, 2016 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Paul E. Olson, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee. Olena Kalytiak Davis, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

---

[*]     Entered under Alaska Appellate Rule 214.

## I.     INTRODUCTION

The superior court terminated a father's parental rights to his son on the ground of abandonment, citing the father's incarceration and his failure to parent even when out of prison. The father appeals that decision, challenging only the finding that he was given a reasonable time to remedy the conduct that put his child at risk. We conclude that the superior court's finding was not clearly erroneous and therefore affirm the termination of the father's parental rights.

## II.     FACTS AND PROCEEDINGS

Dane T. and Camille are the parents of Paxson,[1] who is an Indian child within the meaning of the Indian Child Welfare Act (ICWA).[2]  Camille voluntarily relinquished her parental rights to Paxson and is not a party to this appeal.

When Paxson was born in February 2012, Dane was out of prison on probation.[3]  He and Camille lived together after Paxson's birth but their relationship deteriorated; Dane contended it was because of Camille's drug habit, but Camille's mother, Anya, testified it was because of Dane's anger and jealousy.[4]  In September 2012 Camille moved from the apartment she shared with Dane to Anya's house, and in December she moved into her own apartment nearby.

---

[1]     We use pseudonyms to protect the parties' privacy.

[2]     25 U.S.C. § 1901 et seq. (2012).

[3]     Convicted of assault, Dane was sentenced to three years in prison with two suspended and five years of probation. His probation had been revoked four times by the time of the termination trial.

[4]     Anya agreed that Camille had a serious drug problem, testifying that "[Camille] had been on heroin when she got pregnant and then went on Suboxone."

The Office of Children's Services (OCS) became involved with the family on February 9, 2013, a day after Paxson was hospitalized because he had ingested some of Camille's Suboxone pills. OCS concluded it was an accident but started an investigation into the child's safety. An OCS caseworker, Melissa Charmley, attempted to contact Dane to discuss placement for Paxson, reaching him on February 20. Dane told her he was concerned about Paxson's safety in Camille's care. But after Charmley raised concerns about Dane's own living situation, including reports of violence and substance abuse and a pending warrant for his arrest, Dane hung up on her and did not respond to her further attempts to contact him.

When Paxson was due for release from the hospital, OCS allowed Camille to take him only on condition that she return to Anya's house, which she did. Camille and Paxson lived there until early March, when Camille's parents asked her to move out. Charmley contacted Dane to again gauge his interest in serving as a potential placement, but Dane demurred; he still had pending criminal charges and lacked a permanent residence.

OCS convened a team decision meeting in March 2013 to address options for intervention and Paxson's potential placement. Dane was notified of the meeting but did not attend. OCS filed a non-emergency petition for adjudication and placed Paxson with Anya, Camille's mother. An OCS worker testified that she sent "a few letters" to Dane requesting contact but got no response.

At the end of April 2013, OCS located Dane at the Anchorage Correctional Complex. In June Dane stipulated that Paxson was a child in need of aid; OCS's case plan at the time had a primary goal of reunification. Sheree Allard, an OCS social services associate, set up visitation between Paxson and Dane while Dane was incarcerated, but Allard testified that these visits did not go well. With Dane scheduled

to be released on probation in July, Allard gave him her contact information and asked him to call to schedule more visits. Dane called Allard once after his release and gave her two contact numbers. She attempted to reach him at both numbers until the voicemail boxes were full but received no response from him between July 2013 and January 2014. Dane testified at the termination trial that he was "on the run" during this time, apparently to avoid going back to prison for a probation violation.[5] OCS held team decision meetings without him in August and September 2013. In December the law caught up to Dane and he was returned to prison; at his court appearance on January 9 he rejected felony probation and elected to serve a flat-time sentence.

Also in early January 2014, OCS caseworker William James discovered through a records search that Dane was back in prison. James met with Dane on January 10 and explained the consequences of the flat-time sentence, including the possibility that it would lead to the termination of his parental rights. James testified that Dane appeared undeterred, saying that while he was unsure of the exact length of his sentence he hoped to do part of it at a halfway house or on ankle monitoring.

Visitation between Paxson and Dane resumed at the prison, but again, according to Allard, these visits did not go well. Paxson suffered some ill effects such as night terrors, which OCS's ICWA case reviewer testified were likely a trauma response. During this stretch of imprisonment Dane was involved in two fights that resulted in punitive segregation; the fights also prompted his transfer from Anchorage to

---

[5]     Dane testified that he "had a couple of visits" with Paxson surreptitiously while he was "on the run." The testimony of an OCS caseworker, on the other hand, implied that Dane admitted not seeing Paxson at all during that time.

Seward.[6]  Being in segregation restricted his access to the already limited treatment programs available in prison.  He did complete one parenting program while incarcerated, but James testified that when Dane was asked about the program he was unable to say what he had learned.

In May 2014 OCS filed its petition to terminate Dane's parental rights.  The superior court held a trial in the fall of 2014 and issued extensive findings of fact and conclusions of law, both oral and written, in May 2015, granting OCS's petition.  The court found that Dane had abandoned Paxson, causing him to be a child in need of aid, and had failed within a reasonable time to remedy the conduct or conditions that made Paxson a child in need of aid.

## III.    STANDARDS OF REVIEW

"Whether a parent has remedied the conduct or conditions that placed the child in need of aid and whether termination is in the best interests of the child are findings of fact."[7]  "We review these findings for clear error."[8]  "We will conclude that a factual finding is clearly erroneous . . . if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[9]  "Conflicting evidence is

---

[6]    Dane testified that he attempted to appeal his segregation but dropped the appeal in order to get out of segregation faster, under the mistaken assumption that segregation would not affect his eligibility for a halfway house or ankle monitoring.  He also testified that he inquired about early release on parole but his probation officer told him it would be futile to pursue it because of his actions in prison.

[7]    *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 256 (Alaska 2013).

[8]    *Id.*

[9]    *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Maisy W. v. State, Dep't of Health & Soc.*
(continued...)

generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[10] Finally, "[b]ecause 'trial courts are in the best position to weigh witness credibility, . . . we give particular deference to [the superior court's] findings based on oral testimony.' "[11]

## IV. DISCUSSION

The superior court terminated Dane's parental rights on the ground of abandonment. Dane's sole argument on appeal is that "[he] was not given a reasonable time to remedy the concerns causing Paxson to be at risk of harm." Specifically, Dane contends that he should have been given more time because (1) it was very difficult for him to complete treatment for his mental health and substance abuse issues while incarcerated; (2) by the time of trial he was prepared to take responsibility for Paxson, despite having earlier blamed Camille for OCS's involvement; and (3) allowing him more time would cause no harm to Paxson, given that Paxson's foster home is with Anya, who wants to maintain the child's relationship with his father.

---

[9](...continued)
*Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[10] *Id.* (quoting *Maisy W.*, 175 P.3d at 1267).

[11] *Id.* (omission in original) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 n.16 (Alaska 2009)); *see also Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 170 (Alaska 2015) (alterations in original) ("[W]hether the parent has remedied the conduct or conditions . . . that place the child at substantial risk . . . [is a] factual determination best made by a trial court after hearing witnesses and reviewing evidence . . . ." quoting *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008 (Alaska 2011)).

**A.** **The Superior Court Did Not Clearly Err In Deciding That Dane Had Not Remedied His Abandonment Within A Reasonable Time.**

In deciding whether the parent has, within a reasonable time, remedied the conduct or conditions that placed the child at substantial risk of harm, "the court may consider any fact relating to the best interest of the child,"[12] including but not limited to: "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs"; "the amount of effort made by the parent to remedy the conduct"; "the harm caused to the child"; "the likelihood that the harm will continue"; and "the history of conduct or conditions created by the parent."[13] Reasonable time "is statutorily defined as 'a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and development needs, and ability to form and maintain lasting attachments.' "[14] Whether the parent has had a reasonable time to remedy is "made on a case-by-case basis and the amount of time considered 'reasonable' will vary."[15]

---

[12] AS 47.10.088(b).

[13] *Ralph H.*, 255 P.3d at 1008 (citing AS 47.10.088(b)).

[14] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 257 (alteration in original) (quoting AS 47.10.990(28)).

[15] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1108 (Alaska 2011).

1. **The record supports the superior court's findings that the limitations imposed by Dane's incarceration were largely due to his own conduct.**

Describing Dane's failure to remedy the conduct or conditions that made Paxson a child in need of aid, the superior court found that "[d]espite [Dane's] struggle with mental health, [he] rejected OCS's recommendations for mental health assessments," and that "[h]e has not adequately addressed his alcoholism or mental illness though both have negatively impacted his life for years." Dane claims that the superior court erred when it failed to recognize his incarceration as a barrier to the completion of treatment.

But the superior court found that Dane was in prison because of his own actions, and that once in prison "he made it worse. His violent behavior put him in segregation. He made the services even more unavailable than they were by his flat-timing. He failed to comply with his OCS case plan — he made [compliance] impossible. He failed to comply with his probation." The court also found that Dane "disobeyed orders from [prison] staff . . . and assaulted another inmate in a cell. During the time he was in segregation, and due to his own conduct, [Dane] could not avail himself of treatment services or programs at the facility." The court thus concluded that although Dane had time to address his significant problems, he failed to use that time productively because of his own choices. Significantly, the court also found that Dane's efforts at remediation remained inadequate when he was released: "When out of jail, [Dane] made no efforts to be involved in his son's life," "[h]e put his own needs in front of the child's," and "[h]e chose not to be involved." The record provides clear support for these findings, and the superior court did not clearly err in reaching them.

Dane argues that there is clear error in "the court's determination that [he] knowingly chose jail over working his OCS case plan." Specifically, he contends that when he chose to flat-time his sentence — which meant more time in prison with less access to services or to Paxson — he did so without a complete explanation of the

consequences from OCS or the advice of counsel.  It does appear that the superior court erred when it implied that Dane opted to flat-time his sentence only after obtaining the advice of OCS caseworker James, who actually did not meet Dane until after he had made that decision.  But Dane admitted at trial that he had been represented by counsel in both his criminal and CINA cases.  He testified that he consciously avoided requesting probation because he did not want to be supervised any longer than he had to be.  He admitted knowing that flat-timing his sentence meant that Paxson would remain in foster care.  He also testified that he submitted a later request for parole but withdrew it when his probation officer told him it was a waste of time because of his prison disciplinary record.

In short, the evidence supports a conclusion that Dane's difficulty in following his OCS case plan was caused in large part by his own conduct while in prison and his own conscious choices about how to serve his time, which favored his desire for privacy and freedom from supervision post-release over access to rehabilitative services and his child.  The superior court did not clearly err when it failed to find that Dane's ability to remedy his conduct was hampered by circumstances beyond his control.

**2.      The record supports a conclusion that Dane's recent change in attitude toward parenting Paxson does not outweigh his history of disinterest.**

Dane argues that even though he "initially faulted Camille for OCS's involvement in the family's affairs," he has matured, realizes his own role in the family's difficulties, and is prepared to accept responsibility for Paxson.  The State responds that Dane's new attitude does not outweigh his history; though Dane contends he has changed, he made decisions over the life of the case that were not in Paxson's best interests.

"The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[16]  When considering reasonable efforts, "the superior court [can] consider [the parent's] unwillingness to engage in his case plan."[17]  For example, we have held that when a mother with an extensive history of alcohol abuse demonstrated a changed attitude toward parenting at the time of the termination trial, including a full year of sobriety, the change was "very new" and the superior court properly relied upon her prior history in deciding that she had not remedied her conduct in a reasonable time.[18]

Here, the superior court did not clearly err in giving substantial weight to Dane's past unwillingness to parent Paxson.  The court observed that Dane "abandoned this child when the child needed him the most," failing to intervene on Paxson's behalf when Camille's known substance abuse was putting the child at risk.  The superior court noted Dane's "repeated incarceration," his choice to flat-time his sentence even though it meant a longer separation from Paxson, "his untreated substance abuse and untreated mental health, his failure over the time this case has progressed to maintain contact and participate with OCS," and the fact that his efforts were no better outside prison.

---

[16]    *Sean B.*, 251 P.3d at 337 (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 902-03 (Alaska 2003)).

[17]    *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1146 (Alaska 2001).

[18]    *Sherry R.*, 74 P.3d at 902-03.

The superior court also cited the testimony of "[o]ne of [OCS's] experts, Phil Kaufman, MSW, [who] estimated it would take [Dane] another nine-ten months to start treatment, complete it and aftercare, and demonstrate positive behavioral change and sobriety before OCS could start a transition to return the child." The court noted that "[t]his timeline does not include starting a parent-child relationship from scratch." Given the time required for beginning a reunification process even assuming consistent adherence to an OCS case plan, and given Dane's history of failing to engage in such efforts, the superior court did not clearly err when it found that Dane's changed attitude toward parenting was unlikely to make a difference within a reasonable time.

### 3. The record supports a conclusion that Paxson's best interests are served by termination.

Finally, Dane finds error in the superior court's conclusion that immediate termination of his parental rights was necessary in order to free Paxson for adoption. Dane argues that because Anya, Paxson's adoptive parent, is interested in maintaining the father-son relationship, and because there is no "evidence supporting the idea that Paxson would be harmed by enabling further reunification efforts, the court should have given Dane a chance to remedy the concerns at issue outside the incarceration setting."

"We have previously held that a [superior] court may base a failure to remedy finding on the prospect of a lengthy period of time before the child could be reunified with the parent."[19] Although a reasonable time to remedy depends on each specific case, "the statute clearly puts the criteria for 'reasonable time' in terms of the

---

[19] *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 212 (Alaska 2010) (citing *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009)).

child's needs."[20]  "[V]ery young children have unique needs for permanency and bonding."[21]  "The legislature has found that children undergo a critical attachment process before the age of six, and 'suffer tremendously when their bonding processes are interrupted.' "[22]

The superior court in this case relied on the expert testimony noted above that it would take nine or ten months of consistent treatment before Dane could even begin to rebuild the parent-child bond, broken by his past conduct.  The court recounted the testimony of OCS's expert, Kaufman, that "the child has been in OCS custody for the majority of life.  He needs permanency.  He needs to be able to rely on his caregivers to know that they are safe people not engaging in harmful behavior."  The court further noted Kaufman's opinion that "the case has gone on long enough and [Paxson] needs to move on" and that Paxson "needs and deserves permanency in a time frame which meets his developmental needs, and not in the time frame that is needed to accommodate [Dane's] own growth potential."  The superior court noted that Paxson was "deeply bonded with his maternal grandparents who are his primary caregivers" and that the child's placement with them was "a first preference adoptive placement" for ICWA purposes.  The superior court's conclusion — that "it is in [Paxson's] best interests to achieve permanency quickly" — is thus supported by the evidence and not clearly erroneous.

---

[20]    *Christina J.*, 254 P.3d at 1108.

[21]    *Id*. at 1107; *see also Stanley B. v. State, Div. of Family & Youth Servs.*, 93 P.3d 403, 408 (Alaska 2004) (emphasizing children's "immediate need for permanency and stability" and risk of long-term harm if permanent placement is not made immediately).

[22]    *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013) (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003)).

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Dane's parental rights to Paxson.