NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RIHANNA N., ) | |
| ) | Supreme Court No. S-18021 |
| Appellant, ) | |
| ) | Superior Court No. 4FA-19-00020 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1863 – December 8, 2021 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. Claire F. DeWitte, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellee Nick S. Nikole V. Schick, Assistant Public Advocate, Fairbanks, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her two-year-old

---

\*     Entered under Alaska Appellate Rule 214.

daughter. She challenges three of the superior court's findings: (1) that she failed to remedy, within a reasonable time, the conduct and conditions that caused the Office of Children's Services (OCS) to take custody of her daughter; (2) that OCS made reasonable efforts to reunify her with her daughter; and (3) that terminating her parental rights was in her daughter's best interests. We conclude that the superior court's findings are supported by the evidence, not clearly erroneous, and consistent with the statutory requirements. We therefore affirm the order terminating the mother's parental rights.

## II.     FACTS AND PROCEEDINGS

Rihanna N. is the biological mother of two daughters, Helena and Augusta S., now four and two years old respectively.[1] Helena was removed from Rihanna's care after testing positive for methamphetamine at birth, and Rihanna eventually relinquished her parental rights. When Augusta was born in February 2019 she tested positive for methamphetamine as well. She was removed from Rihanna's care and placed in the same foster home as her older sister.

OCS assigned Augusta's case to the same caseworker who had worked with Rihanna and Helena. OCS developed a case plan that required Rihanna to participate in weekly drug testing, get a substance abuse assessment, and attend Augusta's doctor's appointments. OCS also arranged for 12 hours of visitation per week in Rihanna's home, supervised by her brother. The in-home visitation was not successful; after one of the visits Augusta tested positive for exposure to both methamphetamine and marijuana. OCS then arranged for once-weekly visitation through a third-party service provider, the

---

[1]      We use pseudonyms to protect the family's privacy. Augusta's biological father's parental rights were terminated by a separate termination order, which was held in abeyance pending resolution of Rihanna's case. He filed a brief in support of Rihanna's position on this appeal, making the same arguments that she does.

Resource Center for Parents and Children (RCPC). According to the RCPC staff member who worked with Rihanna, the visits "went really well" and Rihanna demonstrated an ability to care for Augusta's needs. When RCPC's services ended, Rihanna began visiting her daughter twice a week at her foster home.[2]

Rihanna made other progress addressing the risk factors that had prompted Augusta's removal. She completed a 14-week outpatient treatment program at the Ralph Purdue Center, underwent a number of mental health assessments,[3] attended therapy, and obtained housing and full-time employment. But there was testimony at the termination trial that Rihanna had tested positive for methamphetamine twice since Augusta's removal, that she consistently tested positive for marijuana in the spring and summer of 2019, and that there was more recent evidence of binge drinking. Rihanna disputed all of this evidence; she contended that the methamphetamine results must have been due to exposure to contaminated surfaces or other users, that she did not smoke marijuana "very often," and that she drank alcohol only on Fridays.

OCS moved to terminate Rihanna's parental rights to Augusta in January 2020, asserting that Rihanna had "not remedied the conduct or conditions . . . that place[d] [Augusta] at substantial risk of harm." The superior court granted OCS's petition following trial. The court found that Augusta was in need of aid under AS 47.10.011, subsections (6) (physical harm or likelihood of physical harm) and (10) (parental substance abuse). It found Rihanna had "not shown lasting change that

---

[2]    There was inconsistent testimony about why RCPC's services ended; we address this discrepancy below when discussing the reasonableness of OCS's efforts to reunify the family.

[3]    These assessments revealed that while Rihanna likely suffered from moderate methamphetamine use disorder and exhibited "some symptoms of depression and anxiety [related to] the removal of her kids," she did not meet the criteria for any other mental health disorder.

would allow [Augusta] to safely return to [Rihanna's] care without risk of harm due to [her] substance abuse and attendant neglect," that OCS had made reasonable efforts to reunite the two, and that terminating Rihanna's parental rights was in Augusta's best interests.

Rihanna appeals.

## III. STANDARDS OF REVIEW

In a child in need of aid case, the superior court's factual findings are reviewed for clear error.[4] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[5] "[C]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[6] "[T]he deference accorded to a superior court's factual findings is particularly appropriate in close cases."[7]

The determinations that a parent has failed to remedy the conditions that placed the child at risk of harm and that termination of parental rights is in a child's best interest are factual findings.[8] " 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.' 'When reviewing mixed questions of law

---

[4]    *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[5]    *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[6]    *Id.* (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[7]    *Id.* (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260 (Alaska 2010)).

[8]    *Id.*

and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[9] "We bear in mind at all times that terminating parental rights is a drastic measure."[10]

## IV. DISCUSSION

### A. It Was Not Clear Error To Find That Rihanna Had Not Remedied The Conduct That Placed Augusta At Risk Of Harm.

"To terminate parental rights, the superior court must find by clear and convincing evidence that the parent has not remedied, within a reasonable period of time, the conduct that placed the child at substantial risk of harm."[11] In making this determination, "the court may consider any fact relating to the best interests of the child."[12]

Rihanna argues that she remedied her conduct by participating in all required assessments, completing the 14-week outpatient treatment program, attending therapy, and having enough negative drug-test results to establish that she was no longer a regular user. She emphasizes that she was found "to be of sound mental health and parenting capacity," took responsibility for causing Augusta's child in need of aid status, and "demonstrated great care and concern" for Augusta by visiting her regularly and tending to her needs.

---

[9] *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.,* 332 P.3d 1268, 1273-74 (Alaska 2014) (first quoting *Sherman B.*, 290 P.3d at 428; and then quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[10] *Charles S.*, 442 P.3d at 788 (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[11] *Id.* at 788-89.

[12] *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 902 (Alaska 2003).

But the evidence supports the superior court's findings that Rihanna failed to remedy her substance abuse, and that her "ongoing substance abuse issues would place [Augusta] at substantial risk of harm if returned to her mother's care." The court noted Augusta's positive test for methamphetamine at birth and her later positive test for both methamphetamine and marijuana in 2019 "while participating in liberal visitation in [Rihanna's] residence." The court also cited Rihanna's own positive test for methamphetamine in April 2020. The court was particularly concerned about Rihanna's excuses — which the court did not find credible — and her failure to "take accountability for her substance use and the dangerous decision to allow unsafe people around her child." According to the court, Rihanna's drinking also raised "concern that she is now substituting one substance for another without addressing the underlying issues that lead her to habitually consume intoxicants." The court's observations reflect those of Rihanna's therapist, who testified about her concern that Rihanna lacked "long-term skills that [would] help her remain sober from methamphetamine and possibly alcohol use as well"; developing those long-term skills was one of the goals of her therapy.

In *Barbara P. v. State, Department of Health & Social Services*, we affirmed the superior court's finding that a mother's compliance with her case plan, sobriety, and completion of substance abuse treatment and parenting education were insufficient to remedy the behavior that placed her child at risk of harm when the mother had not "internalized what she ha[d] learned and there [was] no real assurance that [she would] not fall back into her old dysfunctional ways."[13] In *Sherry R. v. State, Department of Health & Social Services, Office of Children's Services*, we concluded that a mother had not remedied the behavior that placed her child at risk of harm despite a year of sobriety because she had a history of relapsing and "it [was] unclear the degree

---

[13]     234 P.3d 1245, 1260 (Alaska 2010) (alteration in original).

to which she accept[ed] her problem."[14]  The superior court's conclusion here was similar: Rihanna's "lack of accountability, coupled with [her] ongoing substance abuse, [put Augusta] at risk of harm."  This finding is not clearly erroneous.

**B.**  **The Superior Court Did Not Err In Finding That OCS Made Timely, Reasonable Efforts To Reunify Rihanna With Augusta.**

To terminate parental rights the superior court must also find that OCS made timely, reasonable efforts to provide family support services to help the parent remedy the problematic conduct.[15]  These efforts must involve "(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid" and "(2) actively offer[ing] the parent . . . and referr[ing] the parent" to these services.[16]  "In reviewing whether OCS made reasonable efforts, a court considers the state's reunification efforts in their entirety."[17]

In its finding of reasonable efforts, the superior court noted that OCS began offering Rihanna "regular UAs and substance abuse treatment to address her use of methamphetamine" starting in 2017, two years before Augusta was born; that OCS "offered services to [Rihanna] throughout her pregnancy"; and that after Augusta's birth it "offered parenting education to help support [Rihanna] in caring for her young children."  The court's written decision described in some detail the assessments, drug-testing regimens, visitation plans, and therapies OCS offered over the course of

---

[14]    74 P.3d at 902.

[15]    AS 47.10.086(a); 47.10.088(a)(3); CINA Rule 18(c)(2).

[16]    *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1164-65 (Alaska 2016) (quoting AS 47.10.088(a)(1)-(2)).

[17]    *Barbara P.*, 234 P.3d at 1262.

several years. But the court emphasized the difficulty OCS had in getting Rihanna to engage in these services; it found that she resisted most offers of help until September 2019, when "the services offered through RCPC were successful — so successful, in fact, that [Rihanna] was able to transition to visiting outside of a supervised setting by coordinating family contact directly with [Augusta's] foster parent." The court found that Rihanna's ultimate lack of success was due not to any failure on OCS's part but entirely to her inability to acknowledge and come to grips with her substance abuse notwithstanding the services that OCS provided.

Rihanna argues that there were several serious deficiencies in OCS's efforts, but we disagree that any of her complaints are significant when the case is viewed in its entirety. First, Rihanna alleges that OCS failed to facilitate a working relationship between her and her caseworker, with whom she did not get along. But difficult relationships are not unusual in the fraught context of child in need of aid proceedings, and Rihanna presented no evidence to suggest that the caseworker treated Rihanna differently than her other clients or failed to do her job properly. To the extent the relationship was the result of conflicting personalities, the trial judge was in a better position than we are to evaluate the demeanor and presentation of Rihanna and her caseworker as they testified, and to decide whether Rihanna's complaint is entitled to any weight.[18]

Second, Rihanna asserts that OCS failed to provide collateral information to one of her assessors and "prejudicially label[ed] Rihanna a 'difficult client' to another." The information OCS failed to provide was Rihanna's recent positive drug test, which would have indicated she was under-reporting her substance abuse. The

---

[18]     *See Sagers v. Sackinger*, 318 P.3d 860, 864 (Alaska 2014) (noting that "we give particular deference to the trial court's rulings based on the demeanor of witnesses").

witness who mentioned this gap in his records — a mental health clinician and assessor — did not say that it affected his assessment, and Rihanna does not explain on appeal how it might have. As for the "difficult client" label, it was on "a typed up document just titled 'collateral for [Rihanna N.],' " provided to Rihanna's therapist by OCS at the time of its first referral. It read in part, "[Rihanna] is a difficult client because she does not let you in," then went on to give a history of Rihanna's family and some of her problems with substance abuse. Again, Rihanna does not explain how the writer's observation, relayed to the therapist along with other collateral information, may have prejudiced her case.

Third, Rihanna alleges that "OCS abruptly and without explanation terminated RCPC services" despite the fact that Rihanna "and the mother-daughter relationship [were] thriving with RCPC's help." There was inconsistent testimony about how the RCPC services ended. Rihanna's OCS caseworker testified that Rihanna "had completed the parenting portion of [RCPC's] program," that she no longer needed its supervised visitation services, and that according to RCPC, "[a]nother client needed that service." But an RCPC supervisor testified that Rihanna had not yet completed its program, that OCS failed to communicate with RCPC as it usually did about the decision to terminate Rihanna's participation, and that the decision "didn't make sense." This conflict aside, the evidence shows that Rihanna's visitation actually increased at this point, as Augusta's foster parents coordinated visits at their home. And other than a generalized complaint that she lost RCPC's "reunification services along with the visitation," Rihanna does not explain how this change in services impacted the substance abuse concerns that primarily drove the superior court's decision.

Fourth, Rihanna asserts that "OCS refused to allow [her therapist] to schedule twice weekly sessions with Rihanna, although [the therapist] informed them that it was clinically necessary." The record does not support this assertion. Although

the therapist testified that "typically we have to get an okay from OCS to see a client more often than [once a week]," she did not testify that OCS was asked for its approval and withheld it; rather, she testified that Rihanna's "work schedule [made it] difficult to fit in one session per week . . . at no fault of her own." She testified, "You know, if she was unemployed, then I would definitely say, hey, let's see if we can see each other more often, but fitting the one in in a week seems to be a struggle at times."

The evidence supports the superior court's conclusion that OCS made reasonable reunification efforts by facilitating substance abuse treatment, counseling, parenting classes, and various forms of visitation. We see no error.

## C. The Superior Court Did Not Err In Finding That Terminating Rihanna's Parental Rights Was In Augusta's Best Interests.

Before terminating parental rights the superior court must also find by a preponderance of the evidence that doing so is in the child's best interests.[19] In making this determination, the court "is not required to consider or give particular weight to any specific factor," but it may consider "the bonding that has occurred between the child and [the child's] foster parents, the [child's] need for permanency, and the offending parent's lack of progress."[20]

The superior court found that terminating Rihanna's parental rights was in Augusta's best interests due to the child's need for permanency, the strong bond she had formed with her foster family, and — given that her older sister was part of the foster family already — the importance of keeping siblings together. The court also noted Augusta's foster family's willingness to support a continued relationship with Rihanna. Although Rihanna argues that the court "completely ignored the bond created between

---

[19]     AS 47.10.088(b)-(c); CINA Rule 18(c)(3).

[20]     *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014) (citations omitted).

[her] and Augusta," we disagree. The court specifically acknowledged the mother-daughter relationship and remarked that "[t]his is not an easy situation." But the court concluded that the bond was outweighed by the other factors favoring termination. We cannot say that this was clear error.

## V.   CONCLUSION

The superior court's order terminating Rihanna's parental rights is AFFIRMED.