STOWERS, Justice.
I. INTRODUCTION
In 2015 the Office of Children's Services (OCS) took custody of three children due to the father's substance abuse issues and the mother's mental health issues. Both parents failed to make any meaningful progress on their case plans in the first year of OCS's custody. But after moving to Washington in 2016, the parents made significant progress and actively engaged in a variety of services. At the time of the termination trial the father had been sober for two years, but OCS still had concerns regarding the mother's ability to manage her mental health and the parents' ability to safely co-parent all of their children at the same time. In June 2018 the superior court terminated the parents' rights to their three children. The parents appeal, arguing that the superior court erred by finding they failed to remedy the conduct that made their children in need of aid. They also argue that the court erred by finding that termination of their parental rights was in their children's best interests. And the father independently argues the court erred by finding that OCS made reasonable efforts to reunite him with his children.
We conclude that the superior court's finding that the father failed to remedy his conduct is clearly erroneous. We therefore reverse the termination of his parental rights. Because our resolution of the father's parental rights may alter the superior court's best interests analysis with regard to the mother, we vacate the termination of the mother's parental rights and remand this case for further proceedings consistent with this opinion.
II. FACTS AND PROCEEDINGS
A. Facts
Charles S. and Marian V. are the parents of Sierra, Chase, and Thomas, who were ages seven, three, and one at the time of the termination trial.[1] Marian is also the mother of Maya (age nine at trial); although Charles is not Maya's biological father, he has raised her since she was an infant and she calls him "dad."[2] Only the three oldest children - Maya, Sierra, and Chase - are the subjects of this appeal.[3] They have been in OCS custody since January 2015.
1. Events leading to OCS custody
Neither parent disputes that OCS's intervention was necessary due to Charles's substance abuse issues and Marian's mental health issues. Charles began using methamphetamine as a teenager and continued using, as well as selling, methamphetamine into his mid-30s. Marian has been diagnosed with anxiety, attention deficit hyperactivity disorder, depression, post-traumatic stress disorder, and reactive attachment disorder. Many *783 of these issues are related to Marian's own experiences in the foster care system and the physical and sexual abuse she suffered as an adolescent. Marian has taken a variety of prescription medications throughout her life. She struggles to regulate her emotional responses, and when overwhelmed she sometimes experiences "meltdowns" or "tantrums."
Charles and Marian were living in Valdez when OCS took custody of Maya, Sierra, and Chase. From 2010 to 2014, OCS received ten reports related to neglect and parental substance abuse and created three out-of-home safety plans for the family. In December 2014 Marian admitted herself to the Alaska Psychiatric Institute (API) because she felt overwhelmed and was concerned she might be a danger to herself. While she was in protective custody at API, OCS received a report of neglect and safety concerns related to Charles's care of the children. OCS removed the children from the home and assumed emergency custody in January 2015, filing an emergency petition to adjudicate the children as in need of aid. In May 2015 the parents stipulated that the children were in need of aid due to Charles's substance abuse and Marian's mental health.
2. OCS custody in 2015 - family remains in Valdez
OCS developed the first case plan for the family in April 2015. OCS directed both parents to address their substance abuse issues, develop parenting skills to meet their children's developmental needs, and maintain contact with the children. Charles completed a mental health and substance abuse assessment in May 2015 and was recommended for inpatient treatment. But he did not attend inpatient treatment or engage in any other treatment until almost a year later, in part because there were no residential treatment centers in Valdez. He completed a few urinalysis tests that were positive for marijuana and eventually stopped attending his scheduled tests. Charles later reported that during this time he was using methamphetamine almost every day. Charles completed a six-week parenting course in 2015 and attended weekly visits with the children, but OCS reported that he did not consistently demonstrate adequate parenting skills during these visits.
Marian was referred to a mental health and substance abuse assessment in January, but she did not complete the assessment until June. She spent six weeks in jail in spring 2015 after a fight with Charles led her to significantly damage his truck. Marian engaged in individual therapy and completed urinalysis tests intermittently throughout 2015. She also participated in the same parenting course as Charles, but she only completed a few of the classes before the family moved away from Valdez. Marian also attended the weekly visits with the children, and while OCS reported positive interactions, it also noted issues with Marian's ability to regulate her emotions.
3. OCS custody in 2016 - family moves to Washington
In March 2016 OCS placed the three children with Charles's father and stepmother in Washington. Charles and Marian also moved to Washington to be closer to their children and to be better able to work on their case plan requirements. Charles completed a one-month inpatient treatment program in May and an intensive outpatient program in September. He testified at the termination trial that he had been sober since moving to Washington - two years by the time of the trial - and OCS confirmed that he had not had a positive urinalysis test result since completing treatment. When asked about his sobriety, Charles stated that he wants to be there for his children, he wants them to see their father be successful, and he wants them to be successful - "I know that my kids need a sober father."
Marian also progressed after moving to Washington. In July 2016 she gave birth to Thomas, and because of the open case with OCS, Child Protective Services (CPS) in Washington initially monitored the parents' ability to care for Thomas. Marian participated in a three-month program that provided weekly at-home parenting classes, as well as weekly visits by a caseworker and a public health nurse. When Marian became pregnant with Thomas, she reportedly stopped taking *784 all prescription medications. While she did not consult a doctor prior to stopping use of her prescriptions, she testified that she has since discussed the decision with her therapist.
Although visitation with the children was inconsistent when the family first moved to Washington, it became more regular after Charles completed his inpatient treatment. Charles and Marian initially lived with Charles's mother, and she supervised overnight weekend visits with the children. Charles's mother testified that these visits were "wonderful," that the children were "extremely happy," that Charles and Marian co-parented well as a team, and that she did not have any safety concerns. But due in part to the parents being allowed unsupervised visitation,[4] OCS terminated the children's placement in Washington, and in April 2017 moved the children to a non-relative foster home in Valdez. Charles and Marian remained in Washington.
4. OCS custody in 2017 - children return to Alaska, parents remain in Washington
Charles's and Marian's engagement in services increased in 2017. In May OCS issued a new case plan for the family, noting that Marian had demonstrated "tremendous growth" in her parental resilience and had learned about parenting and child development through "extensive parenting education." Her goals were to stabilize her mental health by engaging in therapy, to improve her parenting knowledge by engaging in parenting education, and to maintain contact with OCS about case planning. OCS also noted in the case plan that Charles "engages appropriately with the children" but that he "has not demonstrated knowledge of basic or developmental needs." His goals were to identify triggers to his substance abuse by engaging in counseling, to improve his parenting knowledge through parenting education, and to maintain contact with OCS about case planning. OCS stopped requiring the parents to complete urinalysis tests at this time because their results had been consistently negative.
Marian completed a parenting psychological assessment in January 2017; the psychologist recommended she engage in therapy, take parenting classes, and review her medications. She engaged in services at Comprehensive Life Resources (CLR), a community mental health facility, and began seeing an individual therapist. Marian's individual therapy focused on identifying triggers and developing coping skills to more effectively manage her emotional responses, including using dialectical behavior therapy, relaxation techniques, and practicing mindfulness. Marian testified at the termination trial that she had gone nearly two years without a "meltdown." Her therapist testified that Marian had "really decreased her emotional anxiety as regards to being overstressed and overtired," that "her level of speech and connectedness in therapy sessions ha[d] increased," and that "if she can put that to work, show some good strengths to her children, she could be a good mom."
Beginning in August 2017, the CLR therapist also provided weekly family therapy and parenting classes to Charles and Marian. The therapist testified that the couple's relationship had improved through counseling: "[Charles] has been very supportive of [Marian]. ... I've never heard a mean word between them. ... and they say that this time has made them grow closer." The therapist additionally testified that during parenting classes both parents "are very attentive and the other members of the group love them. And they were happy to be there and happy to learn, glad to have the services. ... I've appreciated working with them and seeing *785 them grow." And while the therapist never observed Charles and Marian parenting all four children, she testified that "this mom and dad put forth effort."
In addition to the family therapy and parenting classes, Charles also enrolled in CLR's substance abuse program, attending Narcotics Anonymous-type meetings once every few weeks and seeing an individual therapist once a month. Charles completed a substance abuse assessment in November 2017, which included a finding that he was "in the action stage of change" and that no treatment services were recommended.
Despite the parents' progress at CLR, OCS continued to note struggles during the parents' visitation with the children. After the children were moved to the Valdez foster home, OCS flew the parents to Valdez each month for visitation. In May 2017 OCS provided intermittent supervision during the visits, and in June the visit was unsupervised. But due to concerns with the June visit, visitation with the children transitioned to full supervision. Specifically, OCS had concerns that the parents did not provide sufficient meals for the children; that the children were returned very dirty; that Chase had a small candy in his mouth that OCS thought was a choking hazard, a bruise on his face, and very bad diaper rash; and that the parents transported the children in a car lacking sufficient seats and seatbelts. Visitation from July 2017 forward was limited to monthly supervised visits for one or two days for about two hours at a time. The parents also had weekly phone calls with the children.
OCS's concerns continued with supervised visitation. The OCS caseworker who monitored the visits noted that Marian struggled to divide her attention among all four children and to adequately supervise them; she would fixate on the craft activities she had prepared and struggled to adapt when the children became disinterested; she would snap at the children if they acted out or things did not go exactly as planned; and she would often shut down and mentally disengage by the end of the visits. The caseworker testified that the visits were generally better when both parents were present but that Marian's issues still existed; Marian would sometimes snap at Charles, and Charles would often fail to support Marian. The caseworker met with the parents before visits to discuss what to work on, expectations, and strategies to prepare for the visits. After visits, Marian would typically email the caseworker asking for feedback, and the caseworker would provide her a list of issues to work on. Marian would then share this feedback with her therapist, and they would work on ways to improve during counseling sessions.
In December 2017 the children were moved to a new foster home in Wasilla, and subsequent visits were supervised by Alaska Family Services instead of OCS. The supervisor for the first three visits noted no concerns and reported that the parents did "wonderfully" and did not require intervention or support; she requested that the visits transition from moderate to intermittent supervision. But after supervising additional visits, the supervisor informed OCS that there was more evidence to support its decision to keep visitation at the moderate supervision level.
The OCS caseworker testified that "overall, the visits are a mix of positives. The parents have shining moments, you know, where [Marian] is praising the children, and complimenting the artwork, or complimenting the kind words that they're using." But the caseworker explained there also are struggles, including "the disconnect between the two parents and in their parenting - the snapping at each other, the snapping at the children, especially for [Marian]. And then almost across the board, we see this point where [Marian] isn't able to tolerate the visits anymore."
5. The children's issues and challenges
Throughout their time in OCS custody Maya, Sierra, and Chase displayed a variety of developmental and behavioral issues. Maya was described as parentified and preoccupied with watching over the other children. She also had difficulty establishing appropriate social boundaries; in particular, she had developed an interest in teenage boys and would try to touch, follow, and flirt with them. Sierra was described as defiant; she *786 would push boundaries, act out, and require a lot of redirection. In 2017 she began to wet herself before and after visits and phone calls with her parents. Sierra also required an Individualized Education Program at school and speech therapy. Chase had issues with impulse control and physical aggression, especially with younger children, including Thomas, and Chase would hurt himself when he was upset. Chase also had developmental delays related to his language and social skills.
The children's foster mother from April to December 2017 testified that parenting the three children "was absolutely exhausting ... [t]hey were very high maintenance," and that it was "just more than [the foster parents] could physically handle." She described having to constantly supervise the children "[a]ll the time." She also testified that the children had night terrors that correlated with visits with their parents, though the night terrors subsided over time. The OCS caseworker testified that "when you put all three of the children together, it can be chaos if there is not firm structure for them, parents who follow through, parents who are able to set boundaries." But she emphasized that this also meant "not snapping at them or triggering their mental health issues, and being able to be sensitive and firm at the same time, which is a fine balance. And each of the children have different needs that kind of need different styles of parenting, so that flexibility really comes in."
6. Events prior to termination
In August 2017 Charles and Marian requested that OCS submit their case to CPS in Washington to conduct a home study under the Interstate Compact on the Placement of Children (ICPC).[5] Charles had returned home early from commercial fishing so that the study could be completed, but OCS delayed initiating the ICPC process until late January 2018. In an internal email in August 2017, an OCS supervisor stated:
I really think we have what we need to move forward with termination without asking [Washington] to do a study. And, honestly, I think asking them to do a study could potentially hurt our case because whoever goes out to do that study won't have all the information we have .... We could end up with an approved placement study that we disagree with.
The ICPC process eventually moved forward, however, and in February 2018 a home study was conducted. The Washington CPS worker who conducted the home study noted no concerning conditions and described the home as small but organized by the parents in a way to provide space for the children.
In connection with the ICPC process, Charles and Marian took a number of steps to prepare for reunification with their children. Charles's mother described how the parents had baby-proofed the apartment and set up the bedrooms with bunk beds for the girls and a toddler bed for Chase, and they had toys, bikes, and crafts ready for the children. Marian had a sticker chart set up in the home, which she planned to use to reward and incentivize good behavior. Charles and Marian had also obtained a new vehicle with seven seatbelts to safely transport all the children.
Charles changed jobs so that he would no longer have to leave home to work as a fisherman and could instead be available to support Marian and the children. Marian prepared a list of local service providers that she intended to enroll the children with upon their return, including therapists, doctors, dentists, and schools, and she also identified community activities in which the family could engage. Marian's therapist testified that CLR has a children's program that offers individual therapy, family therapy, case management, school assistance, home support, and peer support, and that CLR was ready to have a team form around the family.
B. Proceedings
1. The termination trial
OCS petitioned to terminate Charles's and Marian's parental rights in June 2016. Because OCS initially held the petition in abeyance, and the superior court later granted a *787 continuance, the termination trial did not take place until 2018. The trial began in February 2018 and took place over seven days through April 2018. The superior court heard testimony from the parents, their therapist at CLR, Marian's former foster aunt, the children's foster mother in 2017, a developmental specialist, the current OCS caseworker, Charles's sister and mother, and Marian's sister.
The OCS caseworker testified at length regarding issues with the family's visitation and concerns about the parents' ability to effectively meet their children's needs. Although the caseworker agreed that the parents had engaged in all of OCS's recommended services, and that participating in services is important, she testified that "the part that we really measure is that behavioral change, is being able to show the skills that they've learned consistently with their children. And that's the part that's missing." She testified that OCS's remaining safety concerns regarding Marian were "her mental health and her ability to manage her emotions, and specifically as it relates to the children .... So being able to be flexible in her parenting, being able to support the children's needs and putting them above her own, and supporting their mental health and ensuring their safety." She testified that since beginning to work with Marian in July 2017 she had not seen an improvement in Marian's ability to control her emotions. The caseworker testified that OCS's remaining concerns regarding Charles were "his ability to put his children's needs first, ... recognizing that there's a concern ... with regards to [Marian], ... and being able to recognize safety threats in the children's environment."
Marian's foster aunt has known Marian since she was a child and testified regarding her history with the family. Marian's foster aunt was the family's emergency contact when they lived in Valdez, and she frequently took care of the children when Marian experienced crises or meltdowns. The foster aunt described similar parenting issues as the OCS caseworker - that Marian had an agenda for her visits with the children, was not flexible, and did not adjust well to spontaneity; that she would get distracted and need time to regroup if the visits were longer than two hours; and that the parents would need to be reminded to perform basic parenting duties. Marian had asked her foster aunt to write a letter of support for this case, but she declined. The foster aunt believed that Marian would not be able to parent successfully and that returning the children would set Marian up for failure because she did not believe that Marian had overcome her mental health issues.
Charles's sister, his mother, and Marian's sister each testified to her support of Charles and Marian. Each family member lives within 15 minutes of the parents, and each testified to their ability to support the family when needed. The three family members also testified to Charles's and Marian's parenting abilities. Charles's sister has two children - ages 8 and 11 - that Charles and Marian took care of during the week. Her son is autistic and required a strict daily routine; she testified that her son never had a meltdown while Charles and Marian were caring for him. She also testified that Charles and Marian successfully cared for her two children and Thomas at the same time. Marian's sister discussed the change she had seen in Marian over the last year: "It seems like she's got more tools available to her and that ... she's using those tools to help herself be the best version of herself." Charles's mother and Marian's sister both indicated interest in potentially being an ICPC placement for the children.
Charles and Marian both testified at length. A particular frustration they conveyed was that OCS had not provided sufficient information about their children's special needs, making it difficult during visits to show that they could meet those needs. Charles also expressed that because they only saw the children once a month it was hard for them to effectively practice what they were learning in their parenting classes. Marian testified that her ability to manage her emotions had improved and that she was better able to support her children's needs. Overall both parents communicated their love for their children and their desire to provide a supportive family environment.
*788 At the termination trial's conclusion, the superior court made a number of oral observations but deferred making any findings until its written order. The court noted that the parents had made significant effort and that it no longer had concerns regarding Charles's substance abuse. But the court noted stronger concerns about Marian's mental health issues and whether those issues had been sufficiently remedied. The court also conveyed concern that the children were in seven different placements in three years: "[T]heir various foibles and issues that they have are to a greater or to a lesser extent attributable to those placements."
2. The superior court's termination order
The superior court issued its termination order in June 2018. The court found that Maya, Sierra, and Chase were children in need of aid under AS 47.10.011 subsections (10) (substance abuse) and (11) (mental illness), and that there was some evidence to support findings under subsections (8) (risk of mental injury due to domestic violence) and (9) (neglect). The court also found that Charles and Marian had not, within a reasonable time, remedied the conduct or conditions that placed the children at substantial risk of harm and that returning the children to the parents would place them at substantial risk of physical or mental injury. The court noted that this was the closest factor in this case, but that despite the parents' significant efforts, they had not "exhibited an ability to implement the necessary skills so that the children can be safely returned to their care."
The court also found that OCS made reasonable efforts to provide family support services designed to enable the children to be safely returned to the home. These efforts included case planning and providing family contact, parenting classes, evaluations, urinalysis testing, and counseling. And finally, the court found that it was in the children's best interests to terminate parental rights as the children had been in OCS custody for three years and needed permanency and stability.
Both parents appeal the court's finding that they had not remedied the conduct that caused their children to be in need of aid and its finding that terminating parental rights was in their children's best interests. Charles also appeals the court's finding that OCS made reasonable efforts to reunify him with his children.
III. STANDARD OF REVIEW
Whether parents failed to remedy their conduct and whether termination was in the children's best interests are both factual findings.[6] In child in need of aid (CINA) cases, we review the superior court's factual findings for clear error.[7] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[8] But "[c]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[9] We have noted that "the deference accorded to a superior court's factual findings is particularly appropriate in close cases."[10] "We bear in mind at all times that terminating parental rights is a drastic measure."[11]
IV. DISCUSSION
A. The Superior Court Clearly Erred By Finding That Charles Failed To Remedy His Conduct In A Reasonable Time.
To terminate parental rights, the superior court must find by clear and convincing evidence *789 that the parent has not remedied, within a reasonable period of time, the conduct that placed the child at substantial risk of harm.[12] A "reasonable time" is statutorily defined as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[13] In "making a [failure-to-remedy] determination ... the court may consider any fact relating to the best interests of the child."[14]
Charles argues that because he fulfilled all of his case plan requirements, engaged in all recommended services, and stopped abusing substances, he has remedied his conduct. OCS responds that completing a case plan does not guarantee that a parent has remedied his conduct and that there was ample evidence presented at the termination trial to show that the parents could not safely care for their children. OCS additionally argues that because the failure-to-remedy finding was a close factor, we should accord substantial deference to the superior court's factual findings.[15]
1. Charles remedied his substance abuse issues .
We have previously observed that completing a case plan "does not guarantee a finding that [the parent] has remedied [his] conduct. The question instead is whether [the parent] had remedied the problems that placed [his] children at risk and gained the necessary skills so that the children could be safely returned to [his] care."[16] Charles originally placed his children at risk through his substance abuse. Although he did not engage in treatment until over a year after his children were taken into OCS custody, by the time of the termination trial Charles had successfully completed inpatient and outpatient substance abuse treatment programs, OCS no longer required him to complete urinalysis testing, and he had remained sober for two years. But despite Charles's progress and two years of sobriety, the superior court found that because he "used meth for over two decades it would be highly speculative to predict ongoing, long-term sobriety for him."
OCS points to Sherry R. v. State, Department of Health & Social Services, Division of Family & Youth Services[17] to support its position that Charles's two years of sobriety, after decades of abuse, was insufficient to demonstrate that he remedied his substance abuse problem. In Sherry R. we upheld the termination of parental rights based on the mother's failure to remedy even though she had been sober for one year.[18] But the mother had also attempted seven treatment programs, had a history of relapsing, and it was "unclear the degree to which she accept[ed] her problem."[19]
Charles's case is distinct. He has been sober twice as long as the mother in Sherry R. , and during this case he only attempted treatment once and has remained sober since; he does not have a history of repeated relapse.[20] Charles has also acknowledged his issues, appears to understand the need to stay sober, and has demonstrated his commitment to sobriety. "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior,"[21] but other factors may also be relevant to consider. Here, OCS stopped requiring Charles to take urinalysis tests because *790 of his demonstrated sobriety, and in his last substance abuse evaluation, no treatment services were recommended.[22] Although Charles could have pursued treatment sooner, two years of sobriety with no relapse is significant. And while sobriety alone may not always be sufficient for a parent to demonstrate he has remedied his conduct, Charles was also actively engaged in therapy, parenting classes, and visitation with his children. Given these facts, the superior court clearly erred in finding that Charles failed to remedy his substance abuse issues. If we were to conclude otherwise, there would be very few, if any, scenarios where a parent with past substance abuse issues would be able to demonstrate he had remedied his conduct.
2. The superior court did not make sufficient neglect or domestic violence findings.
The superior court noted in its termination order that some evidence was presented to support CINA findings as to AS 47.10.011(8) (risk of mental injury due to domestic violence) and (9) (neglect) and that the court "can and does consider all of the evidence in the aggregate." The court then noted that Charles failed to acknowledge OCS's concerns that his stepmother may have abused the children and that Charles failed to acknowledge Marian's inability to parent all four children at once. The superior court concluded that his failure to recognize these basic safety concerns called into question his protective capacities. But it is unclear if the court intended to link this general conclusion to a finding that the children were in need of aid due to neglect or exposure to domestic violence. There must be a link between the CINA finding and the failure-to-remedy finding.[23]
OCS did not argue at the termination trial that Charles neglected his children by failing to protect them from Marian's mental health issues.[24] And notably, OCS never altered the "goals" or "next steps" in Charles's case plan to convey to him that protecting the children from Marian's mental health issues was something that he needed to work on or overcome to regain custody of his children. Instead, OCS argued that the parents neglected the children based on evidence from 2013 and 2014 - prior to OCS taking custody - that the children had serious dental issues, that the parents' home was not suitable for children, and that the children were frequently absent from or late to school.
At the termination trial's conclusion, the superior court made the following oral observations about the alleged educational and dental neglect:
[I]t seems to me that that stuff was addressed prior to the kids coming into [S]tate's custody. But I would - I think I need to look at that a little further to *791 ensure myself of that. ... I agree there - the status of the [parents'] household was not great. I don't know that it qualifies as neglect. ... I just don't think that [the issues] rise to the level of a clear and convincing finding. But I'm going to withhold judgment on that one for the moment at least.
But the court's subsequent termination order simply states that there was some evidence to support a neglect finding under AS 47.10.011(9). The court did not make any specific factual findings in its order related to neglect, and significantly, the court did not find neglect by clear and convincing evidence as required by AS 47.10.088(a)(1) and CINA Rule 18(c)(1)(A).
Given the court's hesitation to find the children in need of aid due to neglect at the termination trial's conclusion, and the court's subsequent termination order omitting factual findings related to neglect, it is unclear to us whether the court intended to make a neglect finding. But even if a neglect finding was intended, the court's termination order does not satisfy the requirements of the CINA statute - stating that there is "evidence presented to support findings" does not equate to finding neglect by clear and convincing evidence.[25] On the record before us, we agree with the superior court's oral comments that there is not clear and convincing evidence that the children were in need of aid due to neglect.[26]
We also conclude that even if there was some evidence of educational and dental neglect from 2013 and 2014, OCS did not demonstrate - or even argue - that Charles failed to remedy that neglectful conduct. At trial OCS noted its concerns with Charles's "protective capacity" and his "ability to recognize safety concerns," but it did not connect those concerns to its neglect argument. And OCS does not argue on appeal that the parents failed to remedy the educational and dental neglect. There is also no indication that Charles and Marian neglected any of their parental responsibilities after OCS took custody of the children; they consented to necessary medical procedures and actively engaged in regular visitation with the children.[27] They also candidly acknowledged and remedied OCS's safety concerns by acquiring a vehicle that could transport all four children and preparing their apartment to accommodate the children's return. We conclude that OCS did not present clear and convincing evidence to show, and the superior court did not make sufficient findings to document, that the children were in need of aid due to neglect or that Charles failed to remedy his allegedly neglectful conduct.
Our neglect analysis is equally applicable to the domestic violence issue, and we reach the same conclusion. To support a CINA finding under AS 47.10.011(8), OCS pointed to Marian's 2015 conviction for damaging Charles's truck and the parents' testimony that when OCS first removed the children Charles and Marian "were struggling in their relationship" and "[t]here was yelling in front of the children." But at the end of the termination trial the superior court stated: "I've taken [domestic violence] off the table. I suppose I could revisit that in further findings, and maybe I'll find something when I'm going through stuff that will cause me to revisit that. I don't think so though, and that's not my intent." As with neglect, any findings the court may have intended to make in its termination order related to domestic *792 violence are not sufficient to satisfy the requirements of the CINA statute. On the record before us, there is not clear and convincing evidence to support a CINA finding under subsection (8), nor is there clear and convincing evidence that the parents failed to remedy any alleged domestic violence issues.
3. The termination of Charles's parental rights is reversed .
We conclude that the superior court clearly erred by finding that Charles did not remedy his substance abuse issues. We also conclude that OCS did not present clear and convincing evidence to show, and the superior court did not make sufficient findings to document, that Charles failed to remedy conduct related to neglect or domestic violence. Because Charles remedied the conduct that caused his children to be in need of aid, we reverse the termination of his parental rights to Sierra and Chase.[28]
B. The Superior Court Did Not Clearly Err By Finding That Marian Failed To Remedy Her Conduct In A Reasonable Time.
As discussed, to terminate parental rights the superior court must consider "whether [the parent] had remedied the problems that placed her children at risk and gained the necessary skills so that the children could be safely returned to her care."[29] Marian's children were originally at risk due to her mental health issues. In explaining its failure-to-remedy finding, the superior court noted that Marian "continues to exhibit, during visitations, an inability to parent all four of her children at once" and that "[t]here was significant credible testimony that [her] ability to hold it together falls apart in an hour or ninety minutes." The court also noted her long history of mental health issues, expressed concern that she is currently unmedicated, and highlighted her "meltdowns" that affect her ability to parent her children. Marian argues on appeal that she satisfied all of the requirements of her OCS case plans, that her mental health issues do not pose a substantial risk of injury to her children, that the superior court erred by failing to consider her parenting supports in its determination, and that the children's best interests do not support terminating her parental rights.
But as discussed, completing a case plan does not guarantee a finding that a parent remedied her conduct.[30] And while no one appears to dispute that Marian put forward significant effort, it is not clear that she has exhibited an ability to implement the necessary skills to safely care for her children. We have previously noted that "[i]t is entirely possible that there will be some improvement in overcoming mental illness without there being sufficient improvement to demonstrate adequate parenting skills."[31] To terminate her parental rights, OCS needed to prove, by clear and convincing evidence, that her unremedied mental health issues would place the children at "substantial risk of physical or mental injury" if returned to her care.[32] OCS does not argue that the children *793 were at risk of mental injury, but asserts that it only needed to establish a risk of one type of injury, and it demonstrated substantial risk of physical injury. Physical injury is defined under the CINA statutes as "a physical pain or an impairment of physical condition."[33]
Whether Marian's unremedied mental health issues created a substantial risk of physical injury to her children was a factual determination, and in "making a [failure-to-remedy] determination ... the court may consider any fact relating to the best interests of the child."[34] As the superior court noted, there was considerable evidence that Marian "shuts down" after extended periods of parenting, and her inattentiveness could result in physical injury to the children. For example, Chase had significant aggression and impulse issues, particularly toward Thomas and other young children - the foster mother reported that he stabbed Sierra with a chopstick and would push other children down stairs or off playground equipment - and OCS noted instances of Marian's failure to monitor and consistently discipline Chase in response. OCS also noted that during visitation Marian lacked awareness of Thomas pulling on power cords, putting things in his mouth, and standing on a chair. And the children's foster parents described the children as "very high maintenance," stating that it was necessary to constantly supervise them. OCS argues that given these factors, and Marian's inability to maintain her focus and emotional stability during visits, returning the children to Marian's care would expose them to a substantial risk of physical injury.
Although there is conflicting testimony regarding Marian's ability to safely parent her children, the superior court placed great weight on the testimony provided by the OCS caseworker and Marian's foster aunt, and the court does not appear to have accorded much weight to the testimony provided by Charles's sister, his mother, or Marian's sister. It is not our role to reweigh the evidence or to make credibility determinations,[35] and our deference "to a superior court's factual findings is particularly appropriate in close cases."[36] We acknowledge that this is a close case, and we commend the efforts Marian has made to remedy her conduct and reunify with her children. But our review of the record does not leave us with a definite and firm conviction that the superior court made a mistake.[37] The court did not clearly err by finding that Marian failed to remedy, within a reasonable time, the conduct that placed her children at substantial risk of harm.
C. The Superior Court's Best Interests Finding Is Vacated For Reconsideration On Remand.
To terminate a parent's rights, the court must consider the best interests of the children and find "by a preponderance of the evidence that termination of parental rights is in the [children's] best interests."[38] While neither the CINA statutes nor the CINA rules define best interests, we have noted that the best interests analysis "requires a more comprehensive judgment than does determining whether the parent has timely remedied endangering conduct or conditions."[39] The superior court found that terminating Charles's and Marian's parental rights was in their children's best interests because *794 the children had been out of the home for three years, were struggling, and needed permanency and stability. The court concluded that "[c]ontinuing uncertainty as to their fate is quite detrimental to them."
As we have mentioned, the facts of this case are close. The parents put forward considerable effort and made significant progress in remedying their conduct; the children are close with their family; and their youngest sibling lives with the parents. We acknowledge that there are still concerns regarding Marian's mental health and her parenting abilities, and the children are struggling as a result of the instability and uncertainty in their placements. "We have repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[40]
We do not conclude that the superior court clearly erred by finding that termination of Marian's parental rights was in the children's best interests. But in light of our reversal of the termination of Charles's parental rights, we vacate the court's best interests finding with respect to Marian for reconsideration on remand. Because we are reversing the termination of Charles's parental rights to Sierra and Chase, it may no longer be in the children's best interests to terminate their legal relationship with their mother, especially if Charles and Marian intend to maintain their relationship and co-parent their children. This may be particularly true given that Charles is not Maya's biological or adoptive father - if Marian's parental rights to all three children remain terminated but Charles's parental rights to Sierra and Chase are retained, Maya could possibly become legally and physically disconnected from her siblings. Such an outcome likely would not be in the best interests of any of the children. Further, the parents' youngest child, Thomas, remains in their custody. Among other factors on remand, the superior court may wish to consider in its best interests finding the advisability of keeping the siblings together.[41] Accordingly, we vacate the termination of Marian's parental rights and remand for reconsideration of the children's best interests.
Because the termination of Charles's parental rights is reversed and the termination of Marian's parental rights is vacated, OCS must promptly re-engage with Charles and Marian to provide efforts aimed at family reunification, including visitation with the children. We are mindful that Maya, Sierra, and Chase have been in OCS custody since 2015 and of the importance of achieving permanency for these children. The superior court and OCS should therefore expedite further proceedings.
V. CONCLUSION
We REVERSE the termination of Charles's parental rights to Sierra and Chase, VACATE the termination of Marian's parental rights to Maya, Sierra, and Chase, and REMAND this case for further proceedings consistent with this opinion.

We use pseudonyms to protect the family's privacy.

The parental rights of Maya's biological father were terminated in February 2018 and are not at issue in this appeal.

Thomas was born during the proceedings in this case and has resided with his parents since birth; Charles's and Marian's parental rights to Thomas are not at issue.

Charles's mother testified that in December 2016 she permitted Charles and Marian to have an unsupervised visit at their new apartment. She testified that she thought Charles's brother, who was present during the visit, had been approved as a supervisor by OCS. OCS testified that there was an unsupervised visit in March 2017; this visit appears to have been the primary trigger for the children's removal.
We also note that after the children were removed, Maya told her foster parents that Charles's stepmother threatened her, made her take care of her siblings, and used corporal punishment. Maya and Sierra both reported that they were scared of Charles's stepmother and never wanted to see her again.

See AS 47.70.010. The OCS caseworker testified that a positive ICPC home study would be required before the children could be returned to their parents.

Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 290 P.3d 421, 428 (Alaska 2012).

Id. at 427.

Id. at 427-28 (quoting Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 234 P.3d 1245, 1253 (Alaska 2010) ).

Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs. , 175 P.3d 1263, 1267 (Alaska 2008).

Barbara P. , 234 P.3d at 1260.

Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 254 P.3d 1095, 1104 (Alaska 2011) (quoting Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. , 79 P.3d 50, 53 (Alaska 2003) ).

AS 47.10.088(a)(2)(B).

AS 47.10.990(30).

AS 47.10.088(b).

See Barbara P. , 234 P.3d at 1260.

Id. (citing V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. , 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.")).

74 P.3d 896 (Alaska 2003).

Id. at 902-03.

Id. at 898, 902.

We note that prior to OCS's intervention in this case Charles attempted treatment one or two times, when he was much younger.

Sherry R ., 74 P.3d at 903.

Cf. Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 303 P.3d 465, 475-76 (Alaska 2013) (upholding finding that mother failed to remedy conduct when she had been sober eight months but had history of repeated failed treatment attempts and unrebutted expert witness testified that mother was "still in need of additional and lengthy substance abuse treatment, a need that [the mother] does not acknowledge"); Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 254 P.3d 1095, 1105 (Alaska 2011) (upholding finding that mother failed to remedy conduct when she had been sober 34 days but "failed to pursue several opportunities for recommended treatment and was determined to be at high risk of relapse").

See AS 47.10.088(a)(1)-(2). We note that OCS does not argue on appeal that the parents failed to remedy conduct related to neglect or domestic violence; OCS focuses on Charles's substance abuse and Marian's mental health and argues generally that the parents had not demonstrated they could safely parent all four children. Additionally, the children were never adjudicated in need of aid due to neglect or domestic violence. When OCS first took custody, the parties stipulated the children were in need of aid because of Charles's substance abuse and Marian's mental health.

See, e.g. , Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 214 P.3d 284, 292 (Alaska 2009) (finding "that the superior court correctly concluded that [the mother's] inability or unwillingness to prevent [the father] from being around the children amounted to neglect"); Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 162 P.3d 1239, 1244 (Alaska 2007) (upholding CINA finding where "[t]he record shows that [the father] did not prevent the [mother's] abuse and his lack of involvement as a parent often exacerbated [the mother's] abusive behavior").

See AS 47.10.088(a)(1) ; CINA Rule 18(c)(1)(A).

"Clear and convincing evidence is evidence more than a preponderance but less than proof beyond a reasonable doubt." Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs. , 175 P.3d 1263, 1267 n.10 (Alaska 2008). A court "may find neglect of a child if the parent ... fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development." AS 47.10.014.

After OCS takes custody of a child, the parents retain "residual rights and responsibilities" such as the right and responsibility to visit their children, to consent to adoption, and to consent to major medical treatment. AS 47.10.084(c) ; see also Duke S. v. Dep't of Health & Soc. Servs., Office of Children's Servs. , 433 P.3d 1127, 1134 (Alaska 2018) (concluding that evidence did not support neglect finding when father immediately sought and exercised right and responsibility to visit child after learning of paternity).

Because we conclude that the superior court's failure-to-remedy finding with respect to Charles was clearly erroneous, and we reverse the termination of his parental rights, it is not necessary for us to address his additional challenge to the court's reasonable efforts finding and therefore we decline to do so.
But we do note a general concern with OCS's delay in initiating the ICPC home study process. See AS 47.70.010. Given the parents' concerns over being able to meet their case plan requirements if they remained in Valdez, their progress after moving to Washington, the seemingly effective service providers they engaged with at CLR, and their family support network in Washington, it seems that family reunification may have been likelier if the children had remained in or been returned to Washington. We are also concerned by the suggestion that OCS delayed the Washington ICPC home study for tactical litigation reasons and not for the best interests of the children.

Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 234 P.3d 1245, 1260 (Alaska 2010).

Id. (citing V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. , 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.")).

V.S.B. , 45 P.3d at 1208.

CINA Rule 18(c)(1)(A)(ii).

AS 11.81.900(b)(48) ; AS 47.10.990(28) (" '[P]hysical injury' has the meaning given in AS 11.81.900(b)").

AS 47.10.088(b).

Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 289 P.3d 924, 930 (Alaska 2012) ("We defer to a superior court's credibility determinations, particularly when they are based on oral testimony."); Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs. , 175 P.3d 1263, 1267 (Alaska 2008) ("[W]e will not reweigh evidence when the record provides clear support for the superior court's ruling.").

Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 234 P.3d 1245, 1260 (Alaska 2010).

See id . at 1253.

CINA Rule 18(c)(3) ; see also AS 47.10.088(c).

Thea G. v.State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 291 P.3d 957, 966 (Alaska 2013).

Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 233 P.3d 597, 603 (Alaska 2010).

See Craig v. McBride , 639 P.2d 303, 306 (Alaska 1982) (noting in custody context that "maintaining sibling relationships will typically be in the best interests of the child").