NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALLISON O., | ) |
| | ) Supreme Court No. S-18280 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-18-00225 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1929 – November 16, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: George W.P. Madeira, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A mother's parental rights to her son were terminated by the superior court three years after the Office of Children's Services (OCS) took emergency custody. The

---

[*] Entered under Alaska Appellate Rule 214.

superior court found that the mother had failed to remedy the conduct that placed her son at risk. The mother appealed and disputed the court's findings, arguing that they were not supported by evidence and that they failed to account for her efforts to address her addiction. We conclude that the record as a whole supports the court's finding that the mother failed to remedy her substance abuse and therefore affirm the termination order.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

#### 1.     Initial OCS intervention in 2018

Allison is the mother of Bruce (born in 2010) and Laila (born in 2006).[1] In May 2018 Allison voluntarily took Bruce, then seven years old, to Alaska CARES – a child advocacy center that works with advocates and law enforcement on cases involving abuse of children – after an unrelated traumatic incident took place on his school bus. During the CARES visit, staff observed Allison's "jittery behavior" and "scattered thoughts" and suspected she was "under the influence of some kind of mood-altering substance." An OCS caseworker began to investigate and asked whether Allison would submit to a urinalysis (UA). Allison refused, but according to the caseworker, Allison acknowledged she had used heroin and methamphetamine two days prior.

Due to Allison's suspected drug use, police brought Laila, then 11 years old, from school to Alaska CARES so she could be interviewed. During her interview Laila reported feeling stressed at home because she was often late to school, and she talked about Allison yelling at her. Laila also disclosed that a man was living with them who would watch the children and pick them up from school. She further revealed that the man had touched her inappropriately. OCS verified that the man was a registered sex

---

[1]     We use pseudonyms for all family members to protect their privacy. This appeal concerns only Allison's parental rights to Bruce.

offender with a conviction for sexual assault of a minor. OCS also confirmed that his phone number was listed as an emergency contact with the children's school. When Allison was confronted with Laila's report, she confirmed that she knew the man was a sex offender but stated she did not believe Laila's statement that the man had touched her inappropriately. Instead, she insisted that Laila liked to tell lies.

Drug tests were performed at Alaska CARES. UAs from both children came back positive for methamphetamine and amphetamine. Laila's hair follicle test was also positive for both drugs.

OCS tried to develop a safety plan for the family to address potential harm to the children from substance use and sexual abuse, but Allison was not able to find anyone appropriate to participate in in-home safety planning. OCS would not permit the children to be in the same home as a registered sex offender, so OCS took emergency custody of both children while they were at Alaska CARES.

**2. Allison's efforts to remain sober from 2018 to 2020**

Throughout the rest of 2018 and early 2019 Allison had mixed success staying sober, following her case plan, and having regular visits with the children. After Allison refused the UA at Alaska CARES, OCS referred her for a substance abuse assessment in June 2018. During the assessment she told her assessor she had last used methamphetamine and heroin earlier that month. She also submitted to a UA, testing positive for marijuana, amphetamine, and methamphetamine. When Allison eventually testified during her termination trial, she admitted using heroin and methamphetamine during that time period and explained that she had "used [drugs] to get into treatment" because she believed "you have to be dirty, otherwise they don't allow you in."

OCS created a case plan in July 2018 that identified specific goals and activities, including working with a counselor, finding a primary care doctor, obtaining an integrated mental health and substance abuse assessment, following through with

treatment recommendations, maintaining stable employment and housing, and becoming a safe and sober parent. Allison testified that she did not recall seeing random UAs as a case plan activity, though she acknowledged caseworkers told her verbally at various points that she needed to submit to UAs. Nevertheless, Allison consecutively missed more than two dozen scheduled UAs between August 2018 and February 2019, when she submitted a hair sample that was positive for methamphetamine, amphetamine, and heroin.

Allison otherwise initially engaged with the activities outlined in her case plan. She completed several assessments, attended two treatment programs, and had consistent visitation with both children. She nonetheless struggled to stay sober during this time period. Allison completed an integrated mental health and substance abuse assessment in September 2018. Allison told her assessor that she last used opiates in June 2018 and reported that, at that time, she used daily. Despite prior contrary admissions, she also claimed that she had not used methamphetamine since 2015. The assessor diagnosed Allison with substance use disorder and social anxiety disorder and recommended outpatient treatment.

In September 2018, soon after the assessment, Allison began intensive outpatient treatment. Records from the treatment provider indicate that by the time Allison graduated from treatment in January 2019, she had stable housing, was employed, and was connected with outpatient services. Bruce attended Allison's graduation ceremony.

Despite successfully completing treatment, Allison again tested positive for methamphetamine and opiates in late February 2019. At OCS's request Allison obtained an updated integrated assessment in April 2019. Allison admitted using methamphetamine and heroin together on 22 of the 30 days prior to the assessment and using marijuana every day. She also consented to a drug test as part of the assessment,

and the results were positive for methamphetamine, amphetamine, and opiates. The assessment recommended Allison attend high-intensity inpatient treatment.

In April 2019 Allison missed two UAs, then submitted to six UAs that were positive for marijuana but negative for methamphetamine, amphetamine, and opiates. From the end of April to the end of June Allison missed three more UAs. By August 2019 Allison was on the wait list for high-intensity inpatient treatment. She was admitted to inpatient treatment in late October. But after only one day of treatment Allison "discharged against staff advice," apparently because she was not allowed to have cigarettes while in treatment.

Despite her continuing struggle with addiction, Allison consistently attended supervised family contact visits with Bruce weekly or twice-weekly throughout 2019. During this time she received positive feedback on her parenting, and the visitation supervisor generally reported no problems or concerns.

Allison began methadone treatment for her substance abuse in early 2020. When a new OCS caseworker was assigned to the case in June 2020, she confirmed that Allison was still participating in the medication-assisted treatment. Allison was not attending required group sessions consistently at this time, but she "was meeting consistently with her treatment provider for one-on-one sessions" and they were working together "to find a therapeutic dose for her methadone."

Due to the COVID-19 pandemic, in-person visits with the children were cancelled in March 2020. Allison began attending video visits instead. At first the video visits went well, but then Bruce's foster mother reported that Allison appeared to be falling asleep and not tracking what was happening. Allison attributed her sleepiness to the side effects of her methadone treatment. The foster parent did not want Bruce to see Allison fade in and out during the video visits and asked OCS to transition the visits to occur by telephone only. Visits around this time became "pretty sporadic," in part

because the foster mother was not "calling in regularly." By August 2020 Allison had resumed weekly video visits with the children. However, Allison's demeanor continued to trouble OCS, so the caseworker asked her to submit to a UA. Allison did not show up for that UA.

### 3. Allison moves to California in 2020 without informing OCS.

Allison continued to attend medication-assisted treatment in Anchorage until around September 2020, when she moved to California without informing OCS. OCS initially struggled to maintain contact with Allison, but the assigned caseworker was finally able to reach her in November 2020. Allison reported that she was struggling with homelessness in California but was engaged in methadone treatment. The assigned caseworker scheduled a follow up meeting later that month, but Allison did not attend.

There is no evidence in the record of Allison's participation in medication-assisted treatment between the UAs completed in September 2020, when she moved to California, and February 2021. Records reflect that Allison began to more regularly engage in methadone treatment in February 2021. During this time period, the assigned OCS caseworker updated Allison's case plan with her over the phone. The case plan activities for Allison included signing a release of information form for the California treatment facility she was working with, staying in touch with OCS, and maintaining family contact. Allison never completed a release of information so OCS was not able to monitor her progress. Records from the California treatment facility admitted at trial suggest that Allison tested positive for "THC, MOP, AMP, MET" in both September 2020 and February 2021.

A new OCS caseworker was assigned in April 2021. He contacted Allison in May, and she told him that she was living on a property that she was helping fix up. She also told the caseworker that she was still engaged in substance abuse treatment at the clinic in California, where she was continuing to receive methadone and going to

-6- *1929*

counseling sessions. The caseworker reminded Allison to stay in touch with her attorney and told her that he would follow up soon.

### 4. Allison stops contacting OCS and ends telephonic visitation.

From May through August 2021 the caseworker could not reach Allison at all. Allison also stopped attending telephonic visits with Bruce during this period. She later explained that she did not have a phone at the time and did not contact anybody because she was "working on me." But even when Allison got a new phone, she did not try to reach OCS or initiate visits with Bruce. The assigned caseworker was able to reach Allison in September 2021 through Laila, and they spoke again a couple of weeks later. The caseworker reached Allison again in October, but they did not have time to go over the case plan during that call. The caseworker tried to follow up multiple times but could not reach her again until November 2021, just before the termination trial. The caseworker had scheduled a visit with Bruce before the November conversation, but Allison did not attend.

Although Allison had attended medication-assisted treatment somewhat consistently since February 2021, she stopped taking methadone entirely in mid-September 2021. She explained that her methadone dosage kept being increased and she was "still having cravings" and "horrible withdrawals," so she decided to take herself off the medication. In ending her methadone treatment, Allison did not consult with a doctor or her counselor at the California treatment center. She claimed that the treatment facility counselor "had kind of quit answering [her] calls" and that she had instead consulted with a separate therapist. Allison explained that she felt methadone was "not really important on preventing [heroin] use" and that she didn't understand why OCS wanted to verify her sobriety or why sobriety was important to her case.

When the OCS caseworker reached Allison in November 2021, she informed him that she was no longer participating in methadone treatment. Allison told

the caseworker that she had been living in a tent but it had burned down. She also explained that she had spoken to Bruce only once during the last six months. Allison subsequently tried to reach Bruce through his foster mother later in November, but the foster mother asked Allison to schedule contact in advance so that she could prepare Bruce to talk with her, noting that Bruce needed routine and was upset by disruptions to his schedule.

## B. Proceedings

OCS filed a petition to terminate Allison's parental rights to Bruce and Laila in November 2019. The petition alleged that both Bruce and Laila were in need of aid due to abandonment, risk of sexual abuse, neglect, and substance abuse.[2] Trial was initially scheduled for April 2020, but it was postponed due to the COVID-19 pandemic. Before the termination trial the court accepted Allison's consent to a guardianship for Laila, so the trial only involved Allison's parental rights to Bruce.

The trial began in November 2021 and took place over three days. A number of OCS caseworkers testified, including the initial caseworker at Alaska CARES and the regional manager who supervised the case from June 2020 until July 2021. OCS also called Bruce's foster mother and Allison's mother. Allison then testified on her own behalf.

After the trial concluded, the superior court made an oral decision on the record. Among other findings and conclusions, the court found by clear and convincing evidence that Allison had abandoned Bruce because she had "failed for a period of at least six months to maintain regular visitation with" him.[3] The court acknowledged that, "at the beginning, her visitation was good and regular," but it "fell seriously off the

---

[2]     AS 47.10.011(1), (7), (9), (10).

[3]     AS 47.10.011(1); AS 47.10.013(a)(3).

wagon" by the time of trial. The court rejected Allison's explanations for her failure to maintain contact with Bruce, stating that despite her lack of a phone, she could have borrowed one or made other arrangements. The court further noted that even when Allison had a phone she "would miss visits and/or call just out of the blue" despite knowing that Bruce needs structure and "reacts very negatively when promises are broken."

The court next found by clear and convincing evidence that Bruce was in need of aid because Allison had exposed him to risk of sexual abuse.[4] It explained that Allison let a man live with the children for a "long, long, long, long time" despite knowing he was a registered sex offender.

The court also found that Bruce was in need of aid because Allison had neglected him. The court noted that Allison "has neglected Bruce" because she "stepped out of the picture" and "for a very, very long time, she's provided nothing to Bruce."

The court further found by clear and convincing evidence that Bruce was in need of aid due to Allison's substance abuse.[5] Noting that substance abuse was "a big issue here," the court found that she had "tried assessments and treatment, she's relapsed, she's missed UAs, she's done some, she's missed UAs, she's turned up positive at times." The court was especially concerned that Allison had "seemingly quit the methadone treatment as of this September," and that there was nothing in the record to show that she was "deemed no longer to need it." Allison's great risk of relapse worried the court, especially given her past history of addiction, treatment, and relapse. The court explicitly found that Allison had relapsed "as recently as February" and noted that "without the appropriate treatment, . . . the risk of relapsing again is great." The court

---

[4]     AS 47.10.011(7).

[5]     AS 47.10.011(10).

also did not find credible Allison's statements that she had overcome her addiction, explaining that she was "simply not realistic in her assessment of her own addiction and situation."

The court then found that OCS had met its burden to prove that Allison failed to remedy her conduct such that returning Bruce to her would place him at substantial risk of physical or mental injury. It explained that she had not overcome her addiction, her living situation was still unstable, and she no longer maintained regular contact with Bruce. This demonstrated to the court that Allison had not "remedied the situation that brings us here" and that she was not "ready to step up to the plate" as a mother.

The court further found by clear and convincing evidence that OCS had made reasonable efforts to reunite the family, and found by a preponderance of the evidence that termination of parental rights was in Bruce's best interests. The court followed its oral ruling with a written order terminating Allison's parental rights to Bruce.

Allison appeals only the superior court's findings that she failed to remedy her conduct placing Bruce at risk of harm.

## III. STANDARD OF REVIEW

We review for clear error the superior court's factual determinations "[w]hether the parent has 'remedied the conduct or conditions . . . that place the child at substantial risk.' "[6] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite

---

[6] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (alteration in original) (quoting AS 47.10.088(a)(2)(A)).

and firm conviction that a mistake has been made."[7] "Conflicting evidence is generally insufficient to overturn the trial court, and we will not reweigh evidence when the record provides clear support for the trial court's ruling."[8] "We bear in mind at all times that terminating parental rights is a drastic measure."[9]

## IV. DISCUSSION

To terminate parental rights the superior court must find by clear and convincing evidence that the parent either "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm," or "has failed, within a reasonable time, to remedy the conduct or conditions . . . that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[10] A reasonable time is defined as "a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[11] The superior court "may consider any fact relating to the best interests of the child" when making this determination, including "the history of conduct by . . .

---

[7] *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 256-57 (Alaska 2013) (quoting *Barbara P.*, 234 P.3d at 1253).

[8] *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013).

[9] *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[10] AS 47.10.088(a)(2).

[11] AS 47.10.990(27).

the parent."[12]

The crux of the court's determination is whether the parent has remedied the problems that placed the child at risk and "gained the necessary skills so that the child[] could be safely returned to [the parent's] care."[13] "A parent's failure to remedy any one of the conditions that placed the child in need of aid leaves the child at risk of harm and therefore supports termination."[14] We have emphasized that "[t]he problems need to be not just addressed but 'remedied,' "[15] so "completion of a case plan does not guarantee a finding that [a parent] has remedied [the] conduct."[16]

Among her arguments related to the superior court's failure-to-remedy findings, Allison contends the superior court clearly erred by finding that she failed to remedy the substance abuse that placed Bruce at risk of harm. She challenges various evidentiary findings as not supported by the record and contends that "[a] proper

---

[12]    AS 47.10.088(b). The statute specifically enumerates the following factors for potential consideration:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
> (2) the amount of effort by the parent to remedy the conduct . . .;
> (3) the harm caused to the child;
> (4) the likelihood that the harmful conduct will continue; and
> (5) the history of conduct by or conditions created by the parent.

[13]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260 (Alaska 2010).

[14]    *Matthew H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 397 P.3d 279, 282 (Alaska 2017).

[15]    *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 558 (Alaska 2017).

[16]    *Barbara P.*, 234 P.3d at 1260.

consideration of her efforts, history, and the unlikelihood that her addiction would cause any future harm to Bruce" demonstrates the court's ultimate failure-to-remedy finding must be reversed. OCS responds that the record supports the court's findings and that those findings are therefore not clearly erroneous.

We conclude that the record as a whole supports the superior court's finding that Allison failed to remedy her substance abuse. The children tested positive for amphetamine and methamphetamine in 2018, and Allison does not contest the court's finding that they were in need of aid due to her substance abuse. After OCS took custody of the children, Allison at times demonstrated significant efforts to remedy her substance abuse. But as the superior court noted, those efforts were insufficient to overcome Allison's long history of addiction, repeated relapses, and recent decision to stop methadone treatment without consulting her treatment provider or OCS.

Allison analogizes her case to *Charles S. v. State, Department of Health & Social Services, Office of Children's Services*.[17] There we reversed the termination of rights of a parent who had been sober for two years without relapse prior to trial, had no history of repeated relapse, actively engaged in therapy and visitation with his children, and was no longer required to take UAs or recommended for treatment services because of his demonstrated sobriety.[18] We note that unlike the parent in *Charles S.*, Allison experienced significant disruptions in her sobriety throughout her family's involvement with OCS, failed to maintain regular contact with OCS during the latter part of her case, and failed to adhere to significant treatment recommendations. The court found that Allison relapsed as recently as February 2021 and noted the evidence suggested she had relapsed more recently, although it did not expressly make that finding. Allison left

---

[17]   442 P.3d 780 (Alaska 2019).

[18]   *Id.* at 789-90.

medication-assisted treatment in September 2021 without discussing that decision with her treatment provider. Once she stopped treatment, she was no longer submitting to UAs, and OCS could not monitor her progress. The court worried about the likelihood of relapse without treatment and thus explained that it could not "find that she's beat her addiction." Although Allison asserted she had stopped treatment because of the negative effects of methadone, the court found that she was "simply not realistic in her assessment of her own addiction and situation." The court explained that "parents should be given credit, a lot of credit, for trying to beat addictions," but it ultimately found that she had failed to remedy her substance abuse.[19] We agree with the superior court that Allison at times made significant efforts to beat her addiction. However, the court's ultimate decision that Allison had not beaten her addiction is amply supported by the record and does not leave us with a firm conviction that an error has been made.[20]

Allison asserts that the record does not support the superior court's finding that she "relapsed as recently as February" 2021. She faults the court for relying on UA records that are difficult to interpret without additional context and suggests that these records do not support the court's finding that she failed to remedy her substance abuse. However, additional trial evidence provided context for the UA records at issue. Allison's UA records appear to depict positive results for "THC, MOP, AMP, MET" in

---

[19]     We do agree with Allison that there is a minor inconsistency in the superior court's findings related to when Allison stopped participating in UAs. The court found that she did not submit to UAs after February 2021, even though the court also found that she was engaged in medication-assisted treatment until September 2021, where she submitted to monthly UAs. We agree with OCS that this inconsistency does not undermine the court's failure-to-remedy finding.

[20]     *See Matthew H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 397 P.3d 279, 282-83 (Alaska 2017) (affirming superior court's failure-to-remedy finding where parent's "root cause" of children's harm remained unremedied).

September 2020 and February 2021. After examining those UA records in the exhibits admitted at trial, Allison's caseworker testified that there were "some recent tests that may have been concerning within the past year to show that there hasn't been . . . a long period of sobriety." When Allison was confronted at trial with the positive February 2021 UA result, she did not contest that the UA records indicated a positive result but instead posited that the sample was tainted because the treatment facility "put two different samples from two different clients in one bag." As mentioned above, the court did not find Allison credible regarding her substance abuse. In light of the record testimony and additional testimony from the caseworker, we conclude that the court did not clearly err in finding that Allison had relapsed as recently as February 2021.

Allison also argues that the superior court should not have relied on her significant number of missed UAs because she was not aware of the UA appointments. She also notes that some of the missed UAs happened when she was participating in treatment elsewhere, so UAs "would have been redundant." Allison acknowledged, however, that caseworkers told her at various points that she needed to submit to UAs, with phone calls notifying her she would need to "take a UA before the end of the day or by the end of the week." Nevertheless, Allison testified that she did not need to do UAs because she had previously tested negative in 2013 — five years before her children were removed — and that she "was waiting for . . . a court order" to comply with regular UAs. The superior court found Allison's explanations for her UA history not credible, and "[w]e give deference to the superior court's credibility assessments, especially when such assessments are based on oral testimony."[21] The court's reliance on and interpretation of Allison's UA history was not clearly erroneous.

---

[21]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 949 (Alaska 2013).

Given our determination that the superior court did not clearly err by finding that Allison failed to remedy her substance abuse and the related risk to Bruce, we need not address the court's other failure-to-remedy findings.

## V.      CONCLUSION

We AFFIRM the superior court's order terminating Allison's parental rights to Bruce.