NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PAMIUQTUUQ C., | ) |
| | ) Supreme Court No. S-18110 |
| Appellant, | ) |
| | ) Superior Court No. 4FA-18- |
| v. | ) 00046CN/00047CN/00048CN |
| | ) (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES, | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 1878 – March 2, 2022 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Mark I. Wood, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, Anchorage, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Grace E. Holden, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee. Margaret McWilliams, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

## I. INTRODUCTION

A mother appeals the superior court's termination of her parental rights. The termination order and this appeal follow a prior termination order that this court

---

\* Entered under Alaska Appellate Rule 214.

reversed based upon the trial court's admission of expert testimony that had not been properly noticed. On remand the Office of Children's Services (OCS) relied in part on testimony from the first trial to make its case during the second termination trial. The mother contends that OCS relied too heavily on that older evidence and that it thus failed to show by clear and convincing evidence that she had not remedied the conditions rendering her children in need of aid.

Because the superior court was entitled to, and did, rely on the full record of evidence admitted in making its termination decision, and because the court did not clearly err by finding that the mother had failed to remedy the conduct and conditions causing her children to be in need of aid, we affirm the termination order.

## II.    FACTS AND PROCEEDINGS

Pamiuqtuuq C. has three children:[1] Billy, Agvik, and Malgi.[2] Pamiuqtuuq is in a relationship and lives with Albert J., the father of Agvik and Malgi. Billy's father is deceased. All three children resided with Pamiuqtuuq and Albert before OCS became involved with the family.

### A.    Concerns Surrounding Domestic Violence And Substance Abuse Led To OCS Involvement With The Family.

Pamiuqtuuq's family experienced several incidents of domestic violence, often tied to substance use, prior to OCS's involvement. In 2009 Pamiuqtuuq filed for a protective order after Albert "kick[ed] her 4 times, once in the neck, shoulder, back, and pelvis." Albert was then convicted for assault as a result of this incident. In 2017 Albert filed for a protective order after Pamiuqtuuq hit him with her keys. As a result, Pamiuqtuuq was also convicted for assault. In January 2018 Billy reported that Albert

---

[1]    Pseudonyms are used for all family members to protect their identities.

[2]    The children are Indian children within the meaning of the Indian Child Welfare Act (ICWA) and are affiliated with the Native Village of Barrow.

and Pamiuqtuuq had been drinking and that an intoxicated Albert punched Billy in the face after he attempted to protect his mother. This incident resulted in a criminal case against Albert. Sometime following this incident, Billy left the household and began living with Pamiuqtuuq's sister.

In April 2018 OCS intervened after receiving a report of alcohol use and domestic violence in the home. OCS caseworkers proceeded to visit the home and interviewed family members. OCS interviewed Agvik while he was at school and determined that the parents had been drinking in the home and "yelling and arguing" the evening prior to the April report to OCS. OCS also spoke with Billy at Pamiuqtuuq's sister's house, and he disclosed the January incident to OCS. In their conversations with OCS, both parents denied any violence in the home at that time. Pamiuqtuuq admitted that she and Albert had been drinking and yelling on the recent night in question but claimed their conduct did not affect the children.

Following the family interviews, OCS made an in-home safety plan for the children. Pamiuqtuuq, Agvik, and Malgi moved in with Pamiuqtuuq's sister, where Billy was already living due to the January incident. The plan permitted Pamiuqtuuq and the children to return to Albert's and Pamiuqtuuq's home to bathe because the sister lived in a dry cabin. Several days into the safety plan, OCS learned that Pamiuqtuuq and Albert were continuing to have contact with the children present. Concerned about continued risk to the children, OCS petitioned for custody, initiated a child in need of aid (CINA) case, and placed the children with their maternal grandmother.

OCS began working with Pamiuqtuuq and Albert sometime between April and June 2018. OCS attempted to refer both parents to the Ralph Perdue Center for substance abuse assessments and treatment and requested that the parents sign releases of information for that purpose; both parents declined. OCS supervised visits for Pamiuqtuuq twice a week at an OCS facility.

In June 2018 OCS created Pamiuqtuuq's first case plan. The plan required Pamiuqtuuq to engage in counseling, to participate in the Changing Patterns course at the Interior Alaska Center for Non-Violent Living, and to complete parenting classes at the Resource Center for Parents and Children (RCPC).

As of January 2019, when OCS updated the case plan, the assigned caseworker noted that Pamiuqtuuq had made almost no progress on the services identified in the initial case plan. She had visited RCPC, but had not engaged in any of the required parenting classes. She had attended some LEAP classes, an alternative domestic violence program that she was already required to attend due to her prior assault conviction. OCS revised the new plan to require that Pamiuqtuuq engage in counseling, participate in RCPC classes, and continue LEAP classes.

In April OCS changed the children's primary permanency goal from reunification to adoption because neither parent had engaged any further in services. OCS petitioned to terminate Pamiuqtuuq's and Albert's parental rights in June. The petition alleged that the children were in need of aid because the parents had caused at least one of the children substantial physical harm, the domestic violence in the home caused or created a risk of mental injury to the children, the parents neglected the children, and the parents' substance abuse impaired their ability to parent and put the children at risk.

After the petition was filed, Pamiuqtuuq participated in additional services, including counseling with a therapist, Randy Lewis, and engaging in some RCPC classes. In July OCS updated Pamiuqtuuq's case plan for the third time, noting that she had begun engaging in counseling and participating in the Changing Patterns program, and had completed a substance abuse evaluation. The updated case plan required her to continue counseling with her therapist, engage in the inpatient substance abuse treatment recommended by her recent evaluation, participate in random urinalysis testing, and

continue engaging in LEAP classes. In September Pamiuqtuuq began outpatient treatment at Ralph Perdue Center. In October, just days before the termination trial began, Pamiuqtuuq graduated from the Changing Patterns course.

**B. The Superior Court Terminated Parental Rights But Pamiuqtuuq Successfully Appealed To This Court.**

The first termination trial occurred in November 2019. Pamiuqtuuq, Albert, Billy, the family's caseworkers, and some of their service providers testified as fact witnesses. OCS also called four expert witnesses: (1) Billy and Agvik's therapist; (2) a provider who conducted a behavioral assessment of Albert; (3) a provider who conducted Pamiuqtuuq's substance abuse assessment; and (4) Pamiutuuq's therapist, Randy Lewis. OCS failed, however, to provide timely notice of its expert witnesses, only filing the required expert disclosures the day of trial, November 4, when those disclosures had been due mid-October.[3] Given the late notice, Pamiuqtuuq moved twice for a continuance prior to the start of trial and objected before each witness testified during trial. The superior court denied the motions for continuance and determined that the witnesses, who each provided services to a family member, would be permitted to testify as "hybrid witnesses" regarding events and opinions already disclosed in their

---

[3] CINA Rule 8(d)(1) states:

> [A] party shall disclose the identity of an expert witness whom the party intends to call at trial and who has been retained . . . to provide expert testimony. For such witnesses, the party shall provide: (A) the expert's curriculum vitae; and (B) a written summary of the substance of the anticipated testimony of the expert, the expert's opinion, and the underlying basis of the opinion.

CINA Rule 8(d)(3) directs that expert disclosures "shall be made at the times and in the sequence directed by the court."

records and within the scope of services they provided.[4]

Several witnesses at the first trial described the parents' lack of awareness of the significant impact of their substance abuse on their children. An RCPC provider testified that Pamiuqtuuq described the alcohol use in the home as her drinking twice a week and Albert often drinking to intoxication, but denied that the drinking had adverse effects on the children. One of Pamiuqtuuq's other providers described Pamiuqtuuq's substance abuse, based upon statements made during her assessment, as consisting of "drinking up to several times a week to the point of intoxication," and also including "daily marijuana use." That provider recommended that Pamiuqtuuq receive a relatively high level of inpatient residential treatment, but, according to one of her caseworkers, Pamiuqtuuq instead completed another assessment that recommended lower-level outpatient treatment. Randy Lewis testified that Pamiuqtuuq may have stopped smoking marijuana, but he was not sure if she "recognize[d] that substance abuse has a negative effect on her children."

Trial testimony also described ongoing concerns related to domestic violence in the home. A prior caseworker testified that domestic violence, as of the first trial, was a "current" issue because Pamiuqtuuq and Albert still lived together. The RCPC provider stated that Pamiuqtuuq lacked awareness about how domestic violence was affecting the children. Randy Lewis added that Pamiuqtuuq did not acknowledge any domestic violence in the home except for the 2017 incident when she struck Albert. She denied any responsibility for her children being in OCS custody, though Lewis believed she was "moving in that direction." In addition to this testimony, the superior court notably allowed multiple hybrid expert witnesses to offer opinion testimony that

---

[4]     *See, e.g.*, *Miller ex rel. Miller v. Phillips*, 959 P.2d 1247, 1250-51 (Alaska 1998) (holding treating physician could testify about patient's treatment despite not being listed in pretrial expert disclosures as he was "hybrid" fact and expert witness).

went beyond the scope of the services those witnesses provided and that had only been disclosed at the start of trial.

The superior court terminated Pamiuqtuuq's parental rights. Pamiuqtuuq appealed the termination order, contending that the superior court had improperly permitted and relied upon late-disclosed expert opinion testimony.

Notwithstanding the appeal, adoption proceedings moved forward, and no party moved for a stay pending the appeal. The grandmother adopted the children in July 2020.

In November 2020 we vacated the first termination order and remanded for further proceedings, holding that the superior court abused its discretion either by denying Pamiuqtuuq's motions for a continuance in light of OCS's late expert disclosures or by permitting the unnoticed experts to testify as "hybrid witnesses" outside "the scope of the services that they provided."[5]

C.     **On Remand OCS Noticed Its Intent To Rely On Fact Testimony From The First Trial And Relied On A Combination Of Prior And New Testimony At The Second Termination Trial.**

Upon remand, the superior court convened in December 2020 and set a trial date for a second termination trial, providing sufficient time for OCS to properly notice its experts. OCS then provided timely notice of its expert witnesses and their opinions. Included within its disclosures, OCS provided notice of some experts who had testified at the first trial, that it ultimately did not call again to provide further testimony at the second trial. This included a provider who assessed Albert's behavior, a provider who assessed Pamiuqtuuq's substance abuse, and Pamiuqtuuq's therapist, Randy Lewis. In addition to the expert disclosures, OCS noticed its intent to rely on fact testimony and

---

[5]     *Pamiuqtuuq C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, S-17677/17728, 2020 WL 6940433, at \*6 (Alaska Nov. 25, 2020).

evidence from the first trial, including that of Pamiuqtuuq's prior caseworkers and service providers. Regarding the "hybrid witness" testimony, OCS indicated that it would rely only on the "factual testimony from those experts."

The second termination trial occurred over three days in May 2021. OCS called several witnesses at the second trial, including the therapist who worked with Billy and Agvik and the family's most recent caseworker.

The children's therapist testified that the physical abuse Billy experienced caused him to struggle with anger and depression, but that following the first trial, Billy felt a release knowing that his siblings were safe. The therapist further testified that, following the first termination trial, Agvik also disclosed regular physical abuse by his parents, and opined that the abuse caused Agvik to suffer anger issues, trouble sleeping, depression, and post-traumatic stress disorder.

The parents' then-current caseworker testified about the parents' situation since the remand. The caseworker testified that in December 2020 OCS contacted Pamiuqtuuq and learned about her progress since the termination trial, including her completion of outpatient treatment. The caseworker also testified that OCS offered services to Pamiuqtuuq, including resuming sessions with her therapist and completing a hair strand drug test. Pamiuqtuuq agreed to participate if OCS wanted her to. According to the caseworker, Pamiuqtuuq also told OCS that Albert was not engaging in services but was doing better with his drinking.

The caseworker recounted that she subsequently contacted the children's grandmother, now also their adoptive parent, to assess resuming family visitation. In that conversation, the grandmother referred OCS to Billy and Agvik's therapist who ultimately recommended that resuming visitation would not be in the children's best interests. The caseworker then testified that she repeatedly attempted to reach Pamiuqtuuq to schedule case meetings either at OCS or at her home. According to the

caseworker, Pamiuqtuuq often did not reply, and she always declined the caseworker's offers to meet with her at home. When the caseworker succeeded in scheduling meetings, Pamiuqtuuq rarely showed up.

During Pamiuqtuuq's and Albert's first in-person meeting with the current caseworker in March, the caseworker testified that the couple shared several updates. Pamiuqtuuq reiterated that she had completed outpatient treatment and Changing Patterns. The parents expressed a desire to see the children, and related that they did not think they had anything to work on. They suggested that they consumed alcohol "less," stating that Pamiuqtuuq only drank on the weekends and Albert drank "less" without specifying how much. They were willing to continue counseling and signed releases of information, allowing OCS to refer them to Randy Lewis.

The caseworker further testified that the parents had an appointment with Randy Lewis on April 23 and that he called her afterwards. She testified that he informed her that the parents still denied they had any issues with drinking, they did not think their home was unsafe, and they did not believe they "need[ed] to change . . . their lifestyle . . . to make the home safe for the children."

In addition to the above witness testimony, the court reviewed and considered the testimony and evidence from the previous trial that OCS had notified the parties and the court it intended to rely on.

### D. The Superior Court Again Terminated Pamiuqtuuq's Parental Rights.

After the second trial ended, the superior court made written findings terminating Pamiuqtuuq's and Albert's parental rights. The court found that clear and convincing evidence supported finding Billy, Agvik, and Malgi in need of aid due to the parents' conduct causing the children physical harm, the domestic violence and abuse causing mental injury to Agvik or risking mental injury to all three children, and the substance abuse impairing Pamiuqtuuq's and Albert's ability to parent and risking

substantial harm to the children.[6]  The superior court further found that there was "clear and convincing testimony" during the first and second trials demonstrating that Pamiuqtuuq had not remedied those conditions.  The court also found by clear and convincing evidence that OCS had made active efforts to reunify the family and by a preponderance of the evidence that termination of the parents' rights was in the children's best interests.  Finally, the court found that the evidence, including testimony by two expert witnesses, established beyond a reasonable doubt that returning the children to their parents' custody would cause the children serious damage.

Pamiuqtuuq appeals, challenging only the finding that she failed to remedy the substance abuse and domestic violence in the home.  Albert is not participating in this appeal.

## III.   STANDARD OF REVIEW

Whether a parent has remedied the conditions rendering his or her children in need of aid is a factual finding "reviewed for clear error."[7]  We consider a factual finding to be clearly erroneous "if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[8]

## IV.   DISCUSSION

---

[6]   *See* AS 47.10.011(6) (defining child in need of aid when suffering physical harm); (8)(A)(B)(ii) (defining child in need of aid when domestic violence causes mental injury or risk of mental injury); (10) (defining child in need of aid when parental substance abuse impairs ability to parent and results in substantial risk of harm to child).

[7]   *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1052 (Alaska 2019).

[8]   *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

To terminate parental rights the trial court must, among other requirements, find by "clear and convincing evidence" either that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm;" or that the parent "has failed, within a reasonable time, to remedy" the same conduct or conditions "so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[9] "A parent's failure to remedy any one of the conditions that placed the child in need of aid leaves the child at risk of harm and therefore supports termination."[10]

A parent has a high bar to clear to remedy the conditions placing his or her children in need of aid.[11] The superior court can find that a parent has failed to remedy even if that parent "[makes] strides towards remedying her conduct" because the court is "entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[12]

Pamiuqtuuq contends that OCS did not meet its burden of demonstrating by clear and convincing evidence that she had failed to remedy the substance abuse and domestic violence that placed her children at risk. She alleges that OCS only speculated that those issues endured after the first termination trial, relying on stale evidence and

---

[9] AS 47.10.088(a)(2); CINA Rule 18(c).

[10] *Matthew H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 397 P.3d 279, 282 (Alaska 2017).

[11] *See Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 558 (Alaska 2017) ("The problems need to be not just addressed but 'remedied.' ").

[12] *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 902-03 (Alaska 2003); *see also Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1163 (Alaska 2016).

ignoring her progress by the time of the second trial.[13]

While we acknowledge that Pamiuqtuuq made some progress on her case plan by the time of the second trial, we conclude that the superior court did not clearly err in finding that Pamiuqtuuq had not remedied the conditions that caused her children to be in need of aid.[14]

We have previously affirmed failure to remedy findings where a parent with a history of substance abuse has failed to recognize that his or her substance abuse was a problem, even where the parent was sober or had completed treatment.[15] Such recognition is crucial to assess whether a parent has actually changed the behavior or condition that placed that parent's children at risk, and whether that parent will maintain such change in the future.[16] Without the parent's acknowledgment that substance abuse

---

[13] In her reply brief, Pamiuqtuuq contends that OCS's exclusive reliance on evidence from the first trial violates her constitutional rights as a parent. OCS did not rely only on evidence from the first trial, but even if it did the superior court may consider first trial testimony that is properly noticed. *See Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 430-31 (Alaska 2012).

[14] The guardian ad litem suggests that this appeal is moot because AS 25.23.140(b) bars collateral attacks on adoptions that occurred more than one year ago and the grandmother adopted the children in July 2020. We decline to address this argument and instead proceed to address Pamiuqtuuq's appeal.

[15] *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104-05 (Alaska 2011).

[16] *Compare Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 789-90 (Alaska 2019) (reversing superior court finding because father completed treatment, maintained sobriety for two years, had no history of relapses, and had acknowledged his substance abuse was a problem), *with Sherry R.*, 74 P.3d at 902-03 (affirming superior court finding that recently sober mother complying with urinalysis failed to remedy because she failed to accept her substance abuse problem and made choices adverse to the children).

is a problem, the superior court is entitled to rely on the parent's history of substance abuse in finding that the parent had "not remedied [their] conduct."[17]

Similarly here, the superior court could fairly conclude based on the totality of the evidence that Pamiuqtuuq had not recognized the impact of substance abuse on her parenting and on her children and, correspondingly, that the safety risk persisted and had not been remedied. Testimony at the first trial revealed that Pamiuqtuuq minimized her substance abuse and denied that it affected the children. The caseworker's testimony during the second trial confirmed that Pamiuqtuuq continued to drink, only claiming to drink "less," and that she denied having any issues with drinking or that it made her home unsafe. She also continued to make choices that would likely adversely affect her children, as she still resided with Albert, who continued to use alcohol and who had not engaged in treatment.[18] Even though Pamiuqtuuq completed some treatment, the superior court did not clearly err in finding that she had failed to remedy conditions placing her children at risk because she still lacked insight into how Albert's and her own drinking harmed and would continue to harm the children.[19]

Moreover, the superior court does not clearly err in finding failure to remedy when a parent continues "to be involved in domestic violence."[20] Even where

---

[17] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260 (Alaska 2010).

[18] *See Christina J.*, 254 P.3d at 1105 (continuing to make choices like remaining in abusive relationship and ignoring recommended treatment showed mother did not accept substance abuse harmed children); *Sherry R.*, 74 P.3d at 903 (continuing relationship with sex offender contributed to failure to remedy finding).

[19] *See Sherry R.*, 74 P.3d at 903; *cf. Charles S.,* 442 P.3d at 789.

[20] *See A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1163 (Alaska 2000).

a parent completes treatment or other services related to domestic violence, that parent must have "internalized" the treatment or services and made corresponding changes in order to remedy the risk of harm associated with domestic violence.[21] In *Barbara P.*, we affirmed the finding that a parent had failed to remedy domestic violence in her home, despite completing services relating to domestic violence, because she had not "internalized" or "fully integrated what she ha[d] learned."[22] The record lacked evidence that the mother had experienced a "concomitant change in [her] overall thinking" and the court still "questioned whether [she] had permanently ended her relationship" with her abusive partner.[23]

This case presents a similar record. Pamiuqtuuq completed some services relating to domestic violence, like engaging with LEAP, graduating from Changing Patterns, and participating in counseling with Randy Lewis. But testimony at the first trial showed that Pamiuqtuuq denied domestic violence being an issue in the home. Testimony at the second trial indicated that Pamiuqtuuq continued to downplay the domestic violence that had occurred in her home, failed to recognize the impact of that violence on her children, rejected the notion that anything needed to change for the home to be safe for the children, and continued to live with Albert, who had not engaged in services related to domestic violence. The totality of the record demonstrates that the superior court did not clearly err in finding that Pamiuqtuuq failed to remedy the risks of harm associated with domestic violence in her home.

## V.    CONCLUSION

Because the superior court did not clearly err in finding that Pamiuqtuuq

---

[21]    *See Barbara P.*, 234 P.3d at 1260-61.

[22]    *Id.*

[23]    *Id.* at 1261.

failed to remedy the substance abuse and domestic violence that rendered her children in need of aid, and because the court properly considered the full record of evidence before it in making that finding, the court's order terminating Pamiuqtuuq's parental rights is AFFIRMED.